**Alma Jean THOMAS and Estella Watson, Plaintiffs,**

**v.**

**The HOUSING AUTHORITY OF the CITY OF LITTLE ROCK, a body corporate; and George Millar, Individually and as Executive Director of the Housing Authority of the City of Little Rock, Defendants.**

**No. LR–66–C–230.**

United States District Court
E. D. Arkansas, W. D.

May 26, 1967.

John W. Walker, Little Rock, Ark., Jack Greenberg, Charles Stephen, Ralston and Charles H. Jones, Jr., New York City, for plaintiffs.

John T. Williams, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a class suit for declaratory and injunctive relief brought by plaintiffs, Alma Jean Thomas and Estella Watson, against The Housing Authority of The City of Little Rock, Arkansas, and George Millar, the Authority's Executive Director. Plaintiffs are both Negro women. They complain that they were denied admission to low rent housing facilities operated by the Housing Authority in Little Rock on the basis of the fact that both are the mothers of illegitimate children. They assert that the Housing Authority's "unwed mother" policy, presently to be described, is violative of the due process and equal protection clauses of the 14th Amendment to the Constitution of the United States. They also allege that the Housing Authority is practicing unlawful racial discrimination in the operation of its facilities, which alleged discrimination is forbidden by the 14th Amendment and by section 601 of the Civil Rights Act of 1964, 42 U.S. C.A. § 2000d. Subject matter jurisdiction is not questioned and is established.

The defendants deny that plaintiffs are entitled to the relief sought, and the cause is now before the Court on the cross-motions of the parties for summary judgment. Controlling facts are not in dispute.

The Housing Authority operates in Little Rock five public housing projects or facilities for the purpose of providing low rent housing accommodations for families of low income. The operation is conducted under a contract between the Housing Authority and the federal Public Housing Administration as provided by the Federal Housing Act of 1937, as amended, 42 U.S.C.A. § 1401 et seq. The Housing Authority is a body corporate and politic organized under the terms of the "Public Housing Act," adopted by the Arkansas Legislature in 1937, Ark.Stats. Ann., § 19–3001 et seq. There is no question that the Housing Authority is a public body, and that in administering the low rent housing program it is performing a public function in undertaking to provide safe, adequate, and decent housing for low income families in line with the declared findings and purposes of the federal and State statutes which have been mentioned.

The Little Rock Housing Authority has been in existence and operation for many years. The policy of the Housing Authority eschews racial discrimination in stated terms as follows:

"The Housing Authority of the City of Little Rock will accept applications for Low-Rent Public Housing in all projects, select tenants for all projects and assign applicants to dwelling units in all projects without regard to race, creed, color or national origin. The Housing Authority * * * will not discriminate because of race, creed, color or national origin in the sale, leasing, rental or other disposition of housing or related facilities (including land) included in the projects or in the use or occupancy thereof. The Housing Authority * * * will not, on account of race, color, creed or national origin deny to any family the opportunity to apply for such housing, nor deny to any eligible applicant the opportunity to lease or rent any dwelling in any project suitable to their (sic) needs."

While that stated policy facially satisfies the requirements of both the 14th Amendment and section 601 of the Civil Rights Act of 1964, the record reflects that three of the five projects have always been, and presumably still are, occupied solely by Negroes, and that the

other two have always been, and presumably still are, occupied exclusively by white tenants. Further, materials of record indicate that the projects occupied by Negroes are identified at "Negro" facilities, and that the other projects are identified as "Caucasian" facilities. As of a comparatively recent date 384 white families were occupying the "Caucasian" facilities, and 705 Negro families were occupying the "Negro" facilities.

The record reflects that the unwed mother policy of which plaintiffs complain was adopted, perhaps informally, by the Commissioners of the Housing Authority in 1959 for the purpose of correcting a serious morals problem which had arisen in certain of the facilities. According to the discovery deposition of Director Millar, certain female tenants of the projects had been engaging in on-premises prostitution and sexual promiscuity to such an extent that older and more settled families of low income were unwilling to apply for admission to the facilities or to continue to reside therein.

The policy was formalized in 1962 and is now included in the Authority's manual of Revised Policy and Procedure. The relevant provision is as follows:

"SUBJECT: Selection of Tenants and Processing Applications.

\* \* \* \* \* \*

"V. *Definitions and Standards.*

"D. A Family—Consists of a 'head' and one or more other persons related to the 'head' by blood, marriage or adoption. Other persons, including foster children and members temporarily absent, may be considered a part of the family group if they are living or will live regularly with the family. To qualify as a family, there must have been a legal marriage. A single, separated or divorced family 'head'

having children born out of wedlock shall not be eligible for admission or continued occupancy.

"A family shall not be eligible for admission or continued occupancy if any family member residing regularly with the family has a child or children born out of wedlock." [1]

As stated, the policy was adopted to meet the 1959 situation which has been described. However, the record is silent as to the extent to which unwed mothers participated in the misbehavior against which the Housing Authority moved, and is likewise silent as to the extent to which that misbehavior resulted in illegitimate births.

Coming now to the facts of the instant case, both plaintiffs applied for admission to low rent housing on September 20, 1966. Copies of their applications are of record. The application of plaintiff Thomas reflects that she has three illegitimate children born between November 11, 1962, and October 6, 1965. She expressed a preference for assignment to Ives Homes, a Negro facility, or to Sunset Terrace, a Caucasian facility, in that order. The application of Watson shows that she has three illegitimate children born between June 12, 1964, and June 6, 1966.[2] She expressed a preference for assignment to Hollingsworth Homes, a Negro facility.

It appears to be conceded that both applicants qualified, aside from the unwed mother policy, as heads of families of low income eligible for low rent public housing, and that space for both of them was available in the facilities for which preferences had been expressed. Both applications were denied solely by reference to the unwed mother policy of the Housing Authority.

1. In view of the quoted language, the references to the Housing Authority's policy as an "unwed mother" policy are somewhat inexact. However, since the term has been used throughout the development of the case and is a brief and convenient one, it will be employed throughout this opinion. While the Authority's statement of policy may not be altogether clear on the subject, the Court will assume that it is directed against a situation in which one or more illegitimate children are actually members of the family group in question.

2. The record does not reflect whether either applicant has given birth subsequent to the filing date of the applications.

### I. The Unwed Mother Policy

On this phase of the case the question for decision is whether a local Housing Authority, administering a low rent public housing program, can validly exclude or evict from occupancy of such housing a family of low income on the sole ground that the head of the family or some member thereof has an illegitimate child or illegitimate children. To put the question slightly differently and in somewhat clearer focus, can the Little Rock Housing Authority validly deny admission to or evict from one of its projects an otherwise eligible low income family by an automatic application of the Authority's unwed mother policy? The question seems to be one of first impression.

In taking up that question, the Court will say preliminarily that on the unwed mother phase of the case the action meets the requirements for a class action set forth in Rule 23 of the Federal Rules of Civil Procedure, as amended in 1966, and the Court now holds that the two individual plaintiffs validly represent a "class" consisting of family groups adversely affected by the unwed mother policy and have standing to seek relief against that policy for the benefit of themselves and other members of the class.

As stated, the Housing Authority is a public body, not a private landlord; hence, it cannot act arbitrarily or capriciously in selecting and evicting its tenants. Rudder v. United States, 96 U.S.App.D.C. 329, 226 F.2d 51. Ark. Stats.Ann. § 19–3011(a) permits the Housing Authority to make needful bylaws, rules and regulations, not contrary to the statute, and necessary to carry into effect the powers and purposes of the agency.

While the statute vests a rule making power in the local Housing Authorities, the regulations and policies which they promulgate must be in harmony with the statute and must bear a reasonable relationship to the low rent housing program and the proper operation thereof. 2 Am.Jur.2d, Administrative Law, §§ 303–304; Asbury Hospital v. Cass County, N.D., 326 U.S. 207, 214, 66 S.Ct. 61, 90 L.Ed. 6; Panama Refining Co. v. Ryan, 293 U.S. 388, 426–430, 55 S.Ct. 241, 79 L.Ed. 446; Gulf, Colorado & Santa Fe R. Co. v. Ellis, 165 U.S. 150, 155–159, 17 S.Ct. 255, 41 L.Ed. 666.

It is at this point that controversy arises. The plaintiffs say that the classification expressed in the Housing Authority's unwed mother policy is unreasonable, arbitrary and capricious, that it has no reasonable relationship to the public housing program and is, in fact, contrary to the aims and objects of that program, and is designed purely as a punitive measure directed against poor people who have become the parents of illegitimate children.

The Housing Authority argues, on the other hand, that the regulation was within the power of the Authority to adopt; that it does not conflict with the low rent housing program; that it is legitimately and reasonably related to that program; that it is in fact necessary to the proper operation of the facilities, and that it is constitutional and valid.

That evils result from slum living is generally accepted; the wide range of alleged evils need not be detailed here. The theory of the low rent housing program is that if families of low income can be removed from the slums and placed in safe, sanitary and decent housing they will be motivated and enabled to lead better, healthier and more productive lives.

In passing upon the question at issue, due regard must be had to the humanitarian nature of the public housing. It is the function of the Housing Authority to carry out that program in the City of Little Rock, that is to say to provide housing for low income families. The Authority is not concerned with punishing people for past misconduct, sexual or otherwise.

The requirements of the federal and State statutes and of the contract between the Housing Authority and the Public Housing Administration relating to the eligibility of families of low in-

come to be admitted to and to remain in the Authority's facilities do not deal specifically with the character, reputation or morals of tenants or prospective tenants.

■ However, it seems clear to this Court that the statutory and contractual eligibility requirements are minimal, and that the Authority must of necessity have the authority to prescribe reasonable criteria for the screening of applicants for admission and for the exclusion of those applicants with respect to whom illegal or disorderly conduct or conduct amounting to a nuisance may reasonably be anticipated. Further, the Authority must have the right to evict from the facilities tenants who are guilty of such conduct after admission.[3]

Unless the agency has that authority in those areas administration of the facilities in an orderly and efficient manner will be disrupted, and, as counsel for the Housing Authority warns, the transplanted tenants may recreate within the facilities the slum environment from which they came. It should be remembered in this connection that many low income families will be helped by a change of their environment; other families and individual members thereof may be helped little if at all. Some people who were bad citizens in the slums will be bad citizens anywhere they may reside.

■ While the unwed mother policy of the Housing Authority doubtless had for its object the elimination of serious sexual misconduct within the facilities which might or might not involve violations of the criminal laws, the Court has come to the conclusion that the policy, as written, cannot be sustained.

In the Court's estimation the fatal vices of the policy are its inflexibility, and its general disharmony with the spirit and aim of the low rent housing program.

The prohibition of the present policy is absolute. It makes no distinction between the unwed mother with one illegitimate child and the unwed mother with ten of such children; it does not take into account the circumstances of the illegitimate birth or births, the age, knowledge, training or experience of the mother, or the possibility or likelihood of future illegitimate births. It completely overlooks the possibility that the mother has reformed, or that if placed in better surroundings she may lead a more conventional life.

Under the regulation, as written, if the head of a family or any member thereof has an illegitimate child, that family is automatically excluded from admission to the facilities, and if an illegitimate child is born into a family group which has been admitted to the facilities, the fact of the birth is an automatic basis for eviction. In the Court's eyes the present regulation is drastic beyond any reasonable necessity in the context in which it was promulgated.

The policy would stand on better ground if it was capable of insuring that all of the tenants of the facilities would be persons of good conduct. That it is not so capable is too manifest to require discussion. The absence of illegitimate children from a family group does not establish the morality of the members of the group or insure lawful conduct of tenants of the Housing Authority.

More basically, an indiscriminate denial of access to public housing to families unfortunate enough to have or acquire one or more illegitimate children would be to deprive of the real or supposed benefits of the program many of

3. This is not to suggest that the criteria for admission necessarily should be the same as for eviction. While the Housing Authority is operating its facilities in the implementation of a humanitarian program designed to help as many poor people as possible, the Housing Authority is also acting as a landlord collecting rents and managing dwelling units. In its capacity as a public landlord the Authority is, of course, concerned with the orderly and efficient administration of the facilities, and that particular concern may be directed more at families which have been admitted to the facilities than at families who are applying for initial admission.

the very people who need it most—the poorest and most ignorant of the poor. An administrative policy which involves such a denial does not square with the humane purpose of the low rent housing program.

It is not necessary for this Court to say in this case how far in the screening of its applicants a local Housing Authority may go in requiring as a condition of admission that the applicant show past conformity with the moral code generally accepted by the community, or how far such an Authority may go in requiring its tenants to conform to that code as a condition of continued occupancy of the facilities. It is sufficient for present purposes for the Court to hold, as it does hold, that a Housing Authority may not exclude from the benefits of public housing a low income family merely because of the incidence of illegitimacy within the family group. Such a policy simply has no place in the low rent housing program, and in that sense is arbitrary and capricious.

Before leaving the unwed mother policy, the Court wishes to emphasize that there are certain things which it is *not* holding.

The Court is not holding that the federal Constitution, the Public Housing Act, or the Arkansas statute, or the contract between the Housing Authority and the Public Housing Administration, require the Commissioners of the Authority or their subordinates to permit the facilities to be operated as brothels or places of assignation. The Housing Authority is not required to tolerate criminal activities within the facilities, or disorderly conduct, or conduct amounting to a nuisance or which seriously violates ordinary standards of decency.

Further, in passing upon an application for initial admission to the facilities the Housing Authority is not required to close its eyes to the fact that the head or a member of the family group has one or more illegitimate children. And the Court thinks that the Authority might permissibly formulate a policy giving some evidentiary or presumptive effect to the presence of illegitimate children in a family group, particularly where there are more than one of such children, where they are of recent birth, and where the births have followed each other in quick succession. If, as is the case of these plaintiffs, a woman has had three illegitimate children in a space of three years, the Court thinks that a Housing Authority as a condition for admitting the woman's family to tenancy in one of its facilities certainly may require some assurance that the family will be satisfactory low rent housing tenants notwithstanding the past conduct of the mother.

From what has just been said it follows that these two particular plaintiffs will not automatically be entitled to admission to the facilities. The Authority is perfectly free to consider under appropriate criteria whether a given unwed mother and her family should be admitted to the facilities. All that the Court holds is that such a mother and family may not automatically be excluded or evicted from the facilities merely because of her status as an unwed mother.

## II. The Question of Racial Discrimination.

 The plaintiffs contend that notwithstanding the Housing Authority's stated policy against racial discrimination, such discrimination is being practiced, and that it is in violation of both the 14th Amendment and the Civil Rights Act of 1964. In support of that position plaintiffs have advanced a number of specific contentions and have cited a number of cases including Kelley v. Altheimer, Arkansas Public School District No. 22, 8 Cir., 378 F.2d 483, rehearing den. at p. 500, which is the latest word of the Court of Appeals for this Circuit on the subject of public school desegregation.

The Court finds it unnecessary and deems it inappropriate in this particular case to pass upon the specific contentions· made by plaintiffs as to the Housing Authority's alleged racial discrimination or to say how far the courts should go in

drawing analogies between racial discrimination problems arising in the public schools and those arising in the context of low rent public housing.

The individual plaintiffs in this case were not barred from the facilities because of their race; they have not been excluded from a "Caucasian" facility as opposed to a "Negro" facility. One of the plaintiffs expressed no preference for assignment to a facility of the former type, and the other's expression of a preference for such a facility was secondary to her expressed preference for assignment to a Negro facility.

Assuming without intimating that the Housing Authority has been guilty or is guilty of invidious racial discrimination in the operation of its facilities, that discrimination has not been practiced against these plaintiffs, at least as yet.

In such circumstances they are not entitled to any personal relief at this time, and consequently are not entitled to obtain relief for other members of the class which they support to represent in this aspect of the litigation. See Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512; McCabe v. Atchison, Topeka and Santa Fe R. Co., 235 U.S. 151, 162, 35 S.Ct. 69, 59 L.Ed. 169; Kansas City, Mo. v. Williams, 8 Cir., 205 F.2d 47; Anderson v. Kelly, M.D.Ga., 32 F.R.D. 355; Clark v. Thompson, S.D. Miss., 206 F.Supp. 539.

■ Whether to entertain a class action rests to some extent in the discretion of the Court. Kansas City, Mo. v. Williams, supra. Although the complaint alleged racial discrimination, and although the matter has been argued in the briefs, it is clear to the Court upon the record as a whole that this aspect of the case has always been of secondary importance. The main thrust of the suit has been directed at the unwed mother policy of the Housing Authority. And the Court thinks that questions of racial discrimination in the Authority's operations will be put into clearer focus and can better be decided in a desegregation case, as such, rather than in this case where the desegregation issue has been entirely secondary.

■ While that portion of the complaint directed against alleged racial discrimination will be dismissed without consideration of the merits, the Court will say that it should be obvious to the Housing Authority that it cannot lawfully maintain segregated low rent housing facilities any more than the University of Arkansas can lawfully maintain segregated dormitories, Whitfield v. Raney, E.D.Ark., No. LR–64–C–111; or the State of Arkansas can maintain a restaurant in the State Capitol Building from which Negroes are excluded, Sutton v. Capitol Club, Inc., E.D.Ark., No. LR–64–C–124; or the City of Little Rock can lawfully operate a segregated municipal auditorium or segregated parks and recreational facilities, Freeman v. City of Little Rock, E.D.Ark., No. LR–62–C–40. And it should also be obvious that the exisence of racial discrimination in the housing facilities is not negatived by a mere disclaimer of any intention to discriminate.

An appropriate decree will be entered.