Margaret RESSLER, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Moon LANDRIEU, Secretary of Housing and Urban Development; John Duffy, Director of Anchorage Area Office of the Department of Housing and Urban Development; United States of America; Alaska Pacific Ventures, a partnership; James W. Y. Wong, Consolidated Services, Inc., Defendants.

Civ. No. A77–228.

United States District Court, D. Alaska.

Nov. 21, 1980.

Alaska Legal Services Corp. Bessie O'Rourke et al., Anchorage, Alaska, for plaintiff Margaret Ressler.

U. S. Atty. Rene Gonzales, Anchorage, Alaska, Herbert Goldblatt, Sheila Lieber, Alphonse M. Alfano, Dept. of Justice, Washington, D. C., for defendant United States.

George Dickson, Anchorage, Alaska, for James Wong, Pacific Ventures & Consolidated Services.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

Plaintiff Margaret Ressler, a lower income resident of Jewel Lake Villa Apartments, brought this class action suit, Fed.R. Civ.P. 23(b)(2), against the Secretary of Housing and Urban Development (hereafter HUD), the director of the Anchorage area office of HUD, and the owners of Jewel Lake Villa Apartments. The class represented by plaintiff, and certified by Order of this court on August 22, 1978, consists of all persons in Alaska who (1) are now or will in the future be eligible to receive the benefits of rent subsidies pursuant to § 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f, and (2) who are not receiving or will not receive benefits under this program because of defendants' illegal acts.

The owners of Jewel Lake Villa Apartments receive the benefit of having their mortgage notes insured by the federal government under § 236 of the National Housing Act, 12 U.S.C. § 1715z–1. Plaintiff seeks benefits under the § 8 Housing Assistance Program of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f, which authorizes the Secretary of HUD to enter into contracts to make assistance payments to owners of existing projects already receiving the benefit of mortgages insured by the government under the National Housing Act.

The assistance contract sets forth a comprehensive scheme wherein the receipt of payments and the retention of the right of individual tenant selection by the owner are conditioned on the owner's compliance with HUD tenant eligibility criteria, *viz* the owner's initial rental of a prescribed minimum percentage of units to "very low–income families," 42 U.S.C. § 1437f(c)(4), and rental of the remaining units to "lower income families." 42 U.S.C. § 1437f(c)(7).

## I

By Order of March 6, 1980,[1] this court granted partial summary judgment to plaintiff and the class she represents, holding that applicants for § 8 housing are entitled to due process under the Fifth Amendment of the United States Constitution. Due process safeguards were triggered by two findings:

–that there was sufficient government involvement in the program to warrant such protection; and

–that plaintiff's interest rose to the constitutionally protected "property" level.

*Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974).

The court found support in the record for a finding that government involvement in the § 8 program was sufficient to subject the actions of the project owners to the requirement of the Fifth Amendment. *Id.* at 487–88. In fact, the government did not contest this point.

The more difficult task was to determine whether plaintiff had a "legitimate, objectively justifiable claim to the benefits of the governmental program." *Id.* at 489; see *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The court found that several factors supported such a claim.

First, the Congressional purpose underlying the § 8 program aims at affording housing benefits to lower–income families: "For the purpose of aiding lower–income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section." 42 U.S.C. § 1437f(a). See *Geneva Towers* at 489–90.

Second, courts have extended the rationale first enunciated in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287

(1970), to protect not merely recipients of public benefits, but applicants for those benefits as well. *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir. 1979). Applicants for public housing in particular have been afforded specific due process protections, *Vandermark v. Housing Authority of the City of York*, 492 F.Supp. 359 (M.D.Pa. 1980); *Neddo v. Housing Authority of the City of Milwaukee*, 335 F.Supp. 1397 (E.D. Wis.1971); *Davis v. Toledo Metropolitan Housing Authority*, 311 F.Supp. 795 (N.D. Ohio 1970), and first had their property interest recognized and protected even before *Goldberg* eliminated the distinction between "rights" and "privileges." *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2 Cir. 1968).

While recognizing that all eligible applicants for § 8 benefits will not receive them, the court emphasized that the reality of limited financial resources did not relieve defendants of the need to insure that available benefits were distributed in a manner which comported with due process. *Cf. Holmes* (procedural safeguards required where a housing authority is faced with a number of eligible applicants that far outstrips the number of available units). The court rejected the argument that the statutory power of tenant selection given to the project owner was inconsistent with the existence of a "legal entitlement" on the part of the applicant, noting that project owners were vested with limited discretion in selecting tenants, were primarily bound by eligibility criteria promulgated by the Secretary, and were subject to sanctions for their non–compliance with these criteria. 24 C.F.R. § 886.120, § 886.129, § 886.130 (1980).

Having determined that the plaintiff's interest in § 8 benefits was entitled to due process protection, the court ordered the parties to submit memoranda on the form and extent of procedural safeguards to be afforded § 8 applicants.[2]

---

1. *Ressler v. Landrieu*, No. A77–228 Civ. (D.Alaska, March 6, 1980) (hereafter *Ressler I*)

2. Since the court's resolution of plaintiff's due process claim required that procedural safeguards be afforded, the court did not find it necessary to consider plaintiff's equal protec-

## II

The parties agree that given a finding of a constitutionally protected property interest, the contours of due process in a particular case are to be determined under the test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334–35, 96 S.Ct. at 902–03.

The application of this balancing test in the subsidized housing area involves a difficult weighing of strong competing interests. The "private interest" of the "lower income" or "very low–income" family which seeks to fulfill an essential human need in applying for these limited housing resources is enormous. On the other hand, the government understandably seeks to minimize the financial cost of the application procedure (both to itself and to the private project owner) and to structure the procedure in a way which is neither so elaborate, expensive, and time–consuming, nor so restrictive of owner discretion in tenant selection, as to discourage private participation in the § 8 program.[3] With these underlying concerns in mind, the inquiry turns to an evaluation of the proposed procedures.

## A. TENANT SELECTION STANDARDS

At the outset, the parties differ over the degree of discretion afforded the project owner in the tenant selection process. The statute itself reflects an accommodation between preserving owner prerogative and insuring that needy families receive the benefit of the government subsidy: "the selection of tenants for such unit shall be the function of the owner, subject to the provisions of the annual contributions contract between the Secretary and the agency ...." 42 U.S.C. § 1437f(d)(1)(A); See too 42 U.S.C. § 1437f(c)(4), (7).

In its proposed regulations, HUD has included language which attempts to define the nature of the owner's statutory discretion in the tenant selection process:

> If the owner of a project participating in the Section 8 program determines that the family is eligible for a unit with Section 8 assistance *and is otherwise acceptable* ...

> If the owner determines that an applicant is ineligible for a unit with Section 8 assistance on the basis of income or family composition, *or that the owner is not selecting the applicant for other reasons related to his ability to fulfill his obligations as a tenant of the project* ...

(Emphasis added).

Plaintiff objects to the inclusion of such language, arguing that while Public Housing Authorities (PHAs) are allowed to apply analagous tenant selection criteria, such criteria, while significantly more specific than those proposed here, have nonetheless often been applied arbitrarily.[4] Plaintiffs argue that these criteria are vague, fail to set forth "ascertainable standards," and are particularly subject to abuse when applied by private project owners who lack access

---

tion claim. Additionally, the court held that HUD's failure to require project owners to fully utilize available § 8 contract authority neither violated national housing policy nor constituted an abuse of discretion by the Secretary. *Ressler I*, at 5–6.

**3.** See Note, *Procedural Due Process in Government–Subsidized Housing*, 86 Harv.L.Rev. 880, 911–12 (1973).

**4.** *McDougal v. Tamsberg*, 308 F.Supp. 1212 (D.S.C.1970); *Colon v. Tompkins Square Neighbors, Inc.*, 294 F.Supp. 134 (S.D.N.Y. 1968); *Thomas v. Housing Authority of the City of Little Rock*, 282 F.Supp. 575 (E.D.Ark. 1967).

to the supervision, training, and legal expertise available to employees of PHAs.

■ The court cannot agree that despite the clear (although not unlimited) statutory grant of discretion to project owners, such owners are nonetheless powerless to deny a § 8 unit to an otherwise eligible applicant who would be likely "to interfere with other tenants in such a manner as to diminish their enjoyment of the premises by adversely affecting their health, safety or welfare or to affect adversely the physical environment or the financial stability of the project . . . ." 24 C.F.R. § 860.205(b) (applying this standard to PHAs). The PHAs properly consider such obviously relevant factors, *Vandermark,* 492 F.Supp. at 363; *Colon v. Tompkins Square Neighbors, Inc.,* 294 F.Supp. 134 (S.D.N.Y.1968) at 138–39; *Thomas,* 282 F.Supp. at 580, and yet the statutory discretion which is afforded private project owners is at least as broad. While there is, of course, a similar risk of abuse by the private owner in employing such criteria (see n. 4), the applicant's right to the court–ordered appeal procedure and (ultimately) the right to judicial review serve to minimize that risk.

Due process does require, however, that specific criteria be applied uniformly to insure that project owners select tenants on the basis of "ascertainable standards." *Holmes* at 265. HUD has not supplied the court with a proposed procedure to insure this result. Such a procedure could, for example, take the form of uniform selection criteria to be applied by all private project owners, or could require owners to submit proposed criteria for approval by HUD. Within 30 days of the date of this order, HUD shall submit a proposed procedure for approval by the court.[5]

## B. WAITING LIST

■ The limited number of § 8 rental units and the large number of applicants for those units points to the necessity of HUD's establishing a "fair and orderly procedure for allocating its scarce supply of housing which due process requires . . . ." *Holmes* at 265. Due process also requires that "in cases where many candidates are equally qualified under these standards, that further selections be made in some reasonable manner such as 'by lot or on the basis of the chronological order of application.'" *Id.*

The court in *Holmes* ordered a public housing authority to implement a waiting list procedure. In *Colon,* applicants for subsidized housing were first afforded similar procedural protection.

While a certain minimal administrative expense in creating and maintaining such lists would be imposed upon project owners, HUD regulations call for waiting list procedures in every other type of § 8 project, both those that are administered by PHAs and those administered by private owners.[6] The court adopts as its starting point the following waiting list procedure proposed by the federal defendants:[7]

> A. If the owner of a project participating in the Section 8 program determines that the family is eligible for a unit with Section 8 assistance and is otherwise acceptable and that units are available, the owner will assign the family a unit of the appropriate size in accordance with HUD standards. If no suitable unit is available and the owner has suitable units under contract, the owner will place

---

5. The court has noted that a private project owner's discretion is limited by HUD's conditioning of the right of tenant selection on "the owner's compliance with HUD tenant eligibility criteria." Title 24 C.F.R. § 886.119(a)(3) delegates to the owner the "[p]erformance of all management functions including the taking of applications, selection of Families including verification of Income and other pertinent requirements . . . ." These economic eligibility criteria are inadequate by themselves to insure

that tenant selection is performed in accordance with "ascertainable standards."

6. 24 C.F.R. § 880.603(b)(2) (New Construction); § 881.603(b)(2) (Substantial Rehabilitation); § 882.207(b) (Existing Housing); § 883.-704(b)(2) (State Housing Agencies); § 884.-214(b)(3) (Rural Rental Housing).

7. This procedure is virtually identical to that used in other § 8 programs, see n. 6.

the family on a waiting list for the project and notify the family of when a suitable unit may become available. If the waiting list is so long that the applicant for a unit with Section 8 assistance would not be likely to be admitted for the next 12 months, the owner may advise the applicant that no additional applications are being accepted for that reason.

In addition, the court adopts the following regulations suggested by plaintiff:

B. Selections from the waiting list shall be made chronologically, according to the date of submission of the application for § 8 benefits, except where certain applicants are entitled to priority as a matter of law.

C. The waiting list will be made available to the applicants upon request in the office of the project manager.

These latter two procedures do much to minimize "the risk of an erroneous deprivation," have high "probable value" as additional procedural safeguards, and impose miniscule administrative burdens on the project owners. Requiring chronological consideration of applicants as units become available effectuates the underlying purpose of the waiting list procedure and eliminates the possibility that the owner will use the waiting list procedure as a means of denying an available unit to an eligible applicant (thereby skirting the due process requirements which an "ineligible" applicant would otherwise enjoy in challenging the owner's determination), while only slightly delimiting the owner's discretion in selecting among wait–listed applicants.

While the private project owner must select tenants chronologically from the waiting list, the court rejects plaintiff's suggestion that selection from the list must be made by the owner as soon as practicable after contract units become available, and

that project owners must take all feasible actions to fill available contract authority if unable to utilize such authority by drawing names from the waiting list. In *Ressler I*, this court rejected plaintiff's argument that HUD's failure to require project owners to fully utilize available § 8 authority violated the national housing policy and constituted an abuse of discretion by the Secretary. Given the Secretary's lawful determination that only project owners who have failed to utilize 80% of their contract authority are subject to sanctions (*viz* a reduction in such authority, 24 C.F.R. § 886.129 [8]), the court declines to nonetheless indirectly require 100% utilization through the waiting list procedure.

## C. NOTICE AND HEARING PROCEDURES

The parties differ sharply in their proposed hearing procedures. The plaintiff argues for an informal hearing before an employee at the local HUD office, while HUD suggests that the administrative cost of such a hearing is prohibitive, and that an unsuccessful applicant is therefore entitled only to a review of a written appeal or a meeting conducted by a supervisory member of the management agent or owner's staff who did not participate in the initial decision to reject the applicant.[9]

The concept of the hearing as the bulwark of due process has been firmly established in a wide variety of contexts. *Goldberg v. Kelly, supra* (termination of welfare benefits); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (employment termination); *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (probation revocation); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (public education). In both the conventional public housing area and the subsidized housing area, federal

---

8. See also the Secretary's use of 24. C.F.R. § 886.109(c) as a means of maximizing owner utilization of available contract authority.

9. The review of the applicant's written response would similarly be conducted by a supervisory member of the management agent or owner's staff who did not participate in the initial rejection decision.

courts have recognized the necessity of providing a hearing both to unsuccessful applicants, *Neddo, Davis, Vandermark,* and to tenants facing eviction. *Caulder v. Durham Housing Authority,* 433 F.2d 998 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971); *Escalera v. New York City Housing Authority,* 425 F.2d 853 (2d Cir. 1970); *Ferguson v. Metropolitan Development and Housing Agency,* 485 F.Supp. 517 (M.D.Tenn.1980). Affording an opportunity for the applicant to present his own arguments and evidence orally is particularly important when the owner's denial may rest "on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Goldberg,* 397 U.S. at 268, 90 S.Ct. at 1020.

■ The court holds that plaintiff is entitled to an informal hearing before an impartial HUD employee, and agrees with plaintiff's contention that HUD's proposed review by a supervisory member of the management agent or owner's staff who did not participate in the original rejection decision is an inadequate safeguard. The questionable ability of the supervisory member to conduct a truly impartial review, particularly in light of the likely close relationship between the reviewing employee and the initial decision maker, as well as the lesser expertise and training of the supervisory member, argue for a hearing conducted before a HUD employee. Simply put, an unsuccessful applicant is entitled to a hearing before an "impartial official." *Escalera,* 425 F.2d at 863.[10]

■ While the court is mindful of the cost associated with such a procedure, the importance of the applicant's interest and the increased risk of an erroneous eligibility determination by a private project owner dictate the above result. The court therefore orders the following notice and hearing procedures:[11]

A. If the owner determines that an applicant is ineligible for a unit with Section 8 assistance on the basis of income or family composition, or that the owner is not selecting the applicant for other reasons related to his ability to fulfill his obligations as a tenant of the project, the owner will notify the applicant in writing within 15 days of that determination and of the specific reasons for it. The written notification shall state: (1) that the applicant has 14 days from receipt to submit a written response to the notice to the local HUD officials; (2) that the applicant may have an attorney or other representative prepare a written response, or appear at the local HUD office; (3) that the applicant's response to the notification does not preclude him from exercising his other rights if he believes he is being discriminated against on the basis of race, creed, religion, sex, or national origin.

B. The review of either the applicant's written response or of the information provided at the informal meeting will be undertaken by an employ-

10. An alternative hearing procedure is employed in PHA-owned projects in other phases of the § 8 program: "Where the owner is a PHA, the applicant may request an informal hearing. If the PHA determines that the applicant is not eligible, the PHA will notify the applicant and inform the applicant that he has the right to request a review by HUD of the PHA's determination." 24 C.F.R. § 880.-603(b)(3), § 881.603(b)(3), § 883.704(b)(3).

The significant feature of this procedure is that the applicant is accorded a hearing before an impartial (PHA) official. While the role of HUD in this procedure is limited to a "review," and not necessarily a hearing on the PHA's determination, such a review would be of little value to an unsuccessful applicant for a privately owned unit, since the initial appeal has been heard only before a private individual.

11. The court earlier concluded that private project owners were statutorily authorized to apply eligibility criteria similar to those applied by PHAs. For this reason, the court rejects plaintiff's suggestion that decisions on eligibility must be made solely "on the basis of the applicant's income and family composition." The court also rejects plaintiff's suggestion that the five day application processing period suggested by plaintiff comports with due process, but that the fifteen day period suggested by HUD does not.

ee at the local HUD office. Within 5 working days of receipt of said written response or of the date of the meeting, HUD shall advise the applicant in writing as to whether the owner's determination is approved or reversed.

C. If, after review, the owner's finding of ineligibility is reversed, the applicant will be placed in a suitable vacant unit, if available. If no such unit is available, he will be placed on a waiting list.

D. The owner will be required to maintain in its files for one year the application, the notification of eligibility or ineligibility, the applicant's written request for a meeting or written response to a negative determination, if any, any other written submissions presented by the applicant or his representative in support of his position, and a copy of HUD's written determination.

Accordingly IT IS ORDERED:

1. THAT the federal defendants, within thirty days of the date of this Order, shall submit a proposed procedure to insure that tenant selection criteria are developed for use by private project owners under the § 8 program.

2. THAT the procedures mandated in the body of this Memorandum be implemented by the defendants so as to afford relief to the plaintiff and the class she represents, as certified by Order of August 22, 1978.