333 S.E.2d 792

John **COLLINS** and Donna Collins

v.

**AAA HOMEBUILDERS, INC., AAA SDP8 Branchlands Apartments, Ltd. and Violet Midkiff, Mgr.**

No. CC940.

Supreme Court of Appeals of West Virginia.

March 27, 1985.

Dissenting Opinion Aug. 7, 1985.

Daniel F. Hedges, Charleston, for plaintiffs.

William D. Levine, Marshall & St. Clair, Huntington, for defendants.

BROTHERTON, Justice:

This case is before us on two certified questions from the Circuit Court of Lincoln County:

(1) Whether the refusal of a realtor/landlord to contract with a tenant or the tenant's family on the basis of a prior criminal conviction of a tenant or family member of a tenant is in violation of the public policy of the State of West Virginia and therefore illegal; and whether a cause of action is stated therefor?;

and

(2) If a cause of action is so stated, what is the measure of damages?

In October, 1983, the plaintiffs, John and Donna Collins, applied for an apartment in a housing project in Branchlands, Lincoln County, which is operated by the defendants. John Collins had a prior criminal conviction, and was on probation at that time. In November, the defendants rejected the application by letter stating, "We do not knowingly admit any persons with criminal records to our apartments, and therefore are rejecting your application."

The plaintiffs filed suit in the Circuit Court of Lincoln County, seeking injunctive

relief, as well as actual and punitive damages. The defendants moved to dismiss the complaint for failure to state a cause of action. The trial court denied the motion and certified to this Court the questions quoted above, in accordance with W.Va. Code § 58–5–2 (Supp.1984).

The plaintiffs, in a voluminous review of contemporary thought on the subject of rehabilitating the ex-offender, urge this Court to find as a matter of law that a landlord cannot categorically exclude a prospective tenant because of a prior criminal conviction. Their position is based on the public policies of providing housing to the citizens of this State and of rehabilitating ex-convicts. The defendants counter that the legislature is better suited than the courts to create new legal rights based on public policy, and that the rule asserted by plaintiffs would infringe the constitutional rights of landlords to deal with their property.

■ We hold in favor of the defendants, based on our conclusions that a private landlord may consider all factors, including criminal convictions, which may affect the health, safety, or welfare of other tenants, and that the legislature has made a comprehensive statement of public policy in this area. Because the petitioner has not stated a cause of action, we do not address the issue of damages.[1]

## I.

We begin with the proposition that a private landlord, like any property owner,

has a basically unrestricted right to deal with his property as he chooses. He may improve it, ignore it, sell it, destroy it, or, in general, rent it to whomever he pleases. His rights are protected by the due process clauses of the federal [2] and state [3] constitutions. In choosing his tenants, a landlord has a legitimate interest in protecting his property, and an interest in protecting the health, safety, and welfare of his other tenants.[4] He may consider any criteria, but especially criteria relevant to these ends.

His discretion is subject, of course, to constitutional and statutory limits. The plaintiffs do not urge such limits, however. Instead, they assert that this Court should create a new legal right in favor of convicted criminals, contending that there are certain criteria, including prior convictions, that are so offensive to public policy that a landlord may not use them as a basis for rejecting a prospective tenant.

■ The legislative branch of government has the primary responsibility for translating public policy into law. *See, e.g., Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781, 785–86 (1981). This is appropriate because the members of the legislature are elected representatives of "the public," and thus have the unique ability to collectively discern public opinion and formulate statements thereof. The legislature in fact has considered the criteria employed by landlords in selecting their tenants, and found certain criteria impermissible: "race, religion, color, national origin, ancestry, sex, blindness and handicap." [5] Refusal to

1. Plaintiffs in their brief raise an additional issue regarding equal protection and due process guarantees as applicable to prospective tenants in federally subsidized housing. This was not, however, included in the complaint filed below, and is not included in the certified question. We will confine our analysis to the question certified. *See, e.g., Brumfield v. Wofford*, 143 W.Va. 332, 335, 102 S.E.2d 103, 105 (1958).

2. U.S. Const. amend. V.

3. W.Va. Const. art. III, § 10.

4. Some courts have interpreted the latter interest as a legal obligation, holding the landlord liable for injuries inflicted on other tenants. *See, e.g., Samson v. Saginaw Professional Bldg.,*

*Inc.,* 393 Mich. 393, 224 N.W.2d 843 (1975) (affirming jury verdict holding landlord liable for injuries inflicted on an employee of one tenant by a mental patient of another tenant).

5. West Virginia Code § 5–11–9(g) (Supp.1984), a part of the West Virginia Human Rights Act, (article 11, chapter 5), makes it unlawful:

... For the owner, lessee, sublessee, assignee or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent, lease, assign or sublease any housing accommodations or real property or part or portion thereof, or any agent, or employee of any of them; or for any real estate broker, real estate salesman, or employee or agent thereof:

rent for any of these reasons gives rise to a statutory cause of action in favor of the rejected applicant. This list does not, however, include criminal convictions, and the rule of construction expressed by the Latin, *inclusio unius est exclusio alterius* (the certain designation of one precludes the implication of another) leads us to the conclusion that the legislature did not intend to include any additional categories. Where, as here, the legislature has made what appears to be a comprehensive statement regarding classifications offensive to public policy, this Court will not add to that list in the absence of constitutional mandate.[6] Accordingly, we answer the first certified question in the negative, i.e., the refusal of a landlord to contract with an applicant because of a prior criminal conviction is not illegal as against the public policy of this State.

Although we sympathize with a truly rehabilitated ex-offender who is refused housing on account of his record, the creation of a new cause of action in favor of ex-convicts is neither a proper exercise of the judicial function nor an appropriate mechanism for achieving the goals of rehabilitation and provision of housing. The language of the United States Supreme Court in *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36, 50–51 (1972), seems particularly apt:

> We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, .... Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions. Nor should we forget that the Constitution expressly protects against confiscation of private property or the income therefrom.

The ruling of the circuit court upon the question certified is reversed, and this action is remanded to that court for disposition in accordance with this opinion.

Certified question answered; case remanded for disposition.

MILLER, Chief Justice, dissenting:

Unfortunately, the majority has misconstrued the nature of the certified question by casting the case as one involving a private landlord. The certified question speaks of the "realtor/landlord," but included in the certified question is the stipulated fact that "the plaintiff and his family applied for tenancy in the *federally* subsidized housing project at Branchland, Lincoln County, operated by the defendants." (Emphasis added). Thus, the housing project in question is federally subsidized and the plaintiff's brief states that the federal subsidy was authorized by the Department of Housing and Urban Development under Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (1982). This "Section 8 New Construction Program" is administered locally by a Public Housing Authority. The defendant does not dispute these facts.

Under the Section 8 program, landlords receive low-interest federal loans and other benefits in return for their agreement to reserve some units for low-income tenants. The local Public Housing Authority pays the landlord the difference between rents paid by the tenant and the maximum approved contract rents for the units. *See generally* 42 U.S.C.A. § 1437f (1978 &

---

(1) To refuse to sell, rent, lease, assign or sublease or otherwise to deny to or withhold from any person or group of persons any housing accommodations or real property, or part or portion thereof, because of race, religion, color, national origin, ancestry, sex, blindness or handicap of such person or group of persons....

This proscription is based on the declaration of public policy found in W.Va.Code § 5–11–2 (Supp.1984).

**6.** In addition we note that the classes enumerated in the statute all involve status, rather than individual responsibility. Our holding that ex-convicts do not comprise an impermissible class in this context thus is in accord with our decisions in the context of equal protection. *See Peters v. Narick*, 165 W.Va. 622, 270 S.E.2d 760, 762–63 (1980).

Supp.1985); 24 C.F.R. § 880.101–.612 (1984).

Unlike the typical government contract whereby a private entity agrees to provide goods or services to the government, apartment owners under the Section 8 program become joint venturers with the Department of Housing and Urban Development in the government's effort to aid low-income families in "obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1982). *See Geneva Towers Tenants Org. v. Federated Mortgage Investors,* 504 F.2d 483, 487–88 (9th Cir.1974); *Ressler v. Landrieu,* 502 F.Supp. 324, 326 (D.Alaska 1980).

The private owner is subject to extensive government regulation including regulation of its marketing and tenant selection policies. 24 C.F.R. §§ 880.601 and 880.603 (1984). These tenant selection policies are explicitly subject to HUD-approved Affirmative Fair Housing Marketing Plans and all Fair Housing and Equal Opportunity requirements. 24 C.F.R. § 880.601(a)(2) (1984). Under the regulations, applicants who are denied tenancy must be given written notice of the reasons and afforded an opportunity to meet with the owner or managing agent. 24 C.F.R. § 880.603(b)(3) (1984).

We recognized, by way of dicta, in *Orteza v. Monongalia County Gen. Hosp.,* 173 W.Va. 461, 318 S.E.2d 40 (1984), that in determining whether there is State action involved in private undertakings, in order to bring the private party's actions under the provisions of the Fourteenth Amendment, several factors are considered. In *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the United States Supreme Court required a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453, 42 L.Ed.2d at 484. In *Blum v.*

*Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), there had to be a sufficiently close nexus between the State and the challenged action of the regulated private entity and a showing that the State has exercised either coercive power or provided significant encouragement to the private entity. A close nexus may also be shown if the private entity exercises powers that are historically the prerogative of the State.[1] State action can also be found if the private entity acts for the State's direct benefit by sharing the rewards and responsibilites of a private venture with the State. *Jackson,* 419 U.S. at 357–58, 95 S.Ct. at 457, 42 L.Ed.2d at 488; *Modaber v. Culpeper Memorial Hosp., Inc.,* 674 F.2d 1023, 1025 (4th Cir.1982). *See also Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Thompson v. Charleston Area Medical Center, Inc.,* 539 F.Supp. 671 (S.D.W.Va.1982).

Such an undertaking under Section 8 has been held to constitute sufficient State action to bring the practices of participating private owners under the requirements of the Due Process Clause of the Fourteenth Amendment. *Ressler v. Landrieu, supra. See also Eidson v. Pierce,* 745 F.2d 453 (7th Cir.1984); *Ressler v. Pierce,* 692 F.2d 1212 (9th Cir.1982). Other federally financed private housing programs have been found to constitute State action. *See Male v. Crossroads Assoc.,* 469 F.2d 616 (2d Cir.1972); *Geneva Towers Tenants Org. v. Federated Mortgage Investors, supra.*

The same standards of nondiscrimination, equal opportunity, and due process are imposed upon participating private owners as would be required if the housing were managed by the government itself. These federal requirements clearly indicate that participating private owners have willingly abdicated their purely private status with respect to tenant selection in exchange for the subsidies and other financial benefits derived from the Section 8 program. The participating owner essentially

---

1. In *Orteza,* the *Blum* test was stated as three factored, but clearly the first two interplay on the nexus question and the third is an independent ground sufficient to trigger the Fourteenth Amendment, viz, exercising powers that are the exclusive prerogative of the State.

agrees to implement federal fair housing standards. Such an agreement, in turn, saves the State the expenses of marketing and managing the housing project.

I believe, therefore, that the equal protection issue is directly before this Court and the majority was unwarranted in avoiding this issue.

Once it is established that the Equal Protection Clause is invoked, the next step is to determine whether the particular subject matter, in this case housing, is a fundamental or constitutional right. If it is so found, then a higher scrutiny is applied. If not found, then the test is whether the regulation bears some rational relationship to a legitimate State purpose. We discussed these two tests in *Cimino v. Board of Education*, 158 W.Va. 267, 274, 210 S.E.2d 485, 490 (1974), where we said:

"Whether a statute or governmental action violates the Equal Protection Clause is a determination made by the application of one of two constitutional tests. The more demanding test relates to statutes which impinge upon sensitive and fundamental rights and constitutional freedoms, such as religion and speech. In order to uphold such a statute, a reviewing court must find that a compelling state interest is served by the classification. *Weber v. Aetna Casualty & Surety Company*, 406 U.S. 164 [92 S.Ct. 1400, 31 L.Ed.2d 768 (1972)]; *Shapiro v. Thompson*, 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)].

"In all other instances, the constitutionality of a statute, challenged under the Equal Protection Clause, is subject to the traditional standard requiring that the state law be shown to bear some rational relationship to legitimate state purposes. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 [93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)]."

*See also Atchinson v. Erwin*, 172 W.Va. 8, 302 S.E.2d 78 (1983); *Donaldson v. Gainer*, 170 W.Va. 300, 294 S.E.2d 103 (1982); *State ex rel. City of Charleston v. Bosely*, 165 W.Va. 332, 268 S.E.2d 590 (1980); *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978); · *State ex rel. Piccirillo*

*v. City of Follansbee*, 160 W.Va. 329, 233 S.E.2d 419 (1977).

The United States Supreme Court has held that housing is not a fundamental or constitutional right and, therefore, the Fourteenth Amendment's strict scrutiny test is not applicable. Instead, the applicable standard is whether the regulation bears a rational relationship to a legitimate State interest. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

The policy against renting to persons who have criminal records must be examined to determine if it is rationally related to its purpose. The defendant advances two reasons for its policy: (1) to protect the landlords' property from loss or damage, and (2) to protect other tenants from criminal conduct. Although excluding all persons with criminal records may indeed work toward accomplishing the stated ends, the blanket presumption that all persons with criminal records are a threat to people and property is difficult to sustain.

The policy excludes all persons with criminal records (and, consequently, the person's entire family as well) from federally funded housing, without regard to the nature and circumstances of the prior crimes, whether misdemeanor or felony, or how far in the past the crime was committed or how well the individual has rehabilitated his life. I believe such an absolute exclusion is overinclusive.

It is true that the Fourteenth Amendment is not violated simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed.2d 369, 377 (1911). *See also Vance v. Bradley*, 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171, 183 (1979). Yet, an overinclusive classification that burdens more people than necessary to achieve the stated purpose is not rationally related and, therefore, violates equal pro-

tection guarantees. *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *see also Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); *cf. New York City Transit Auth. v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).

The United States Supreme Court's latest application of the rational basis test suggests across-the-board discrimination based on irrational fears and invidious stereotypes fails the test. In *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 85 L.Ed.2d 313 (1985), the Court held that a city could not deny a zoning permit to a group home for mentally retarded adults because the city failed to show that such a home would create a greater threat to the community than would other types of group homes for which permits were not required.

Finally, it should be observed that in *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), the United States Supreme Court struck down on equal protection grounds Alabama's constitutional provision disenfranchising persons convicted of a crime involving moral turpitude as it applied to misdemeanants. Although it found a racially motivated intent underlying the provision, there was implicitly an equal protection component in the misdemeanor-felony classification.[2]

Moreover, I believe that the plaintiff is correct in arguing that the defendant's discriminatory policy violates the Due Process Clause of the Fourteenth Amendment. By denying tenancy to all persons with criminal records, defendant has created an irrebuttable presumption that all ex-offenders pose a danger to people and property. Defendant does not allow an applicant to demonstrate his good character, to explain the nature and circumstances of his past offense, to show how he has been rehabilitated, or to point out how long a time has

passed since his last offense. All of these factors, if considered, might very well serve to negate the inference that the ex-offender is a threat to people and property.

"[P]ermanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." *Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63, 68 (1973). *See also Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Carrington v. Rash, supra; Thomas v. Rutledge,* 167 W.Va. 487, 280 S.E.2d 123 (1981).

In *Vlandis,* 412 U.S. at 452, 93 S.Ct. at 2236, 37 L.Ed.2d at 71, the United States Supreme Court declared unconstitutional a Connecticut statute that gave no opportunity to university students from other states to prove they had become Connecticut residents in order to qualify for reduced tuition for state residents: "[I]t is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination."

The defendant may not rely on the irrebuttable presumption that an individual who has a criminal record is a threat to people and property because the presumption is not "necessarily or universally true in fact," and because the defendant has reasonable alternative means to determine whether the applicant would be a threat. While it may be true that treating each applicant individually is an additional burden on the landlord, "administrative conve-

---

**2.** Also implicit in a Fourteenth Amendment analysis is whether the policy is motivated by a "desire to harm a politically unpopular group [which] cannot constitute a *legitimate* governmental interest." *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821,

2826, 37 L.Ed.2d 782, 788 (1973). (Emphasis in original). Obviously, where blanket exclusions are made of unpopular groups, equal protection principles are clearly implicated under this theory.

nience alone is insufficient to make valid what otherwise is a violation of due process of law." *Cleveland Board of Education v. LaFleur,* 414 U.S. at 647, 94 S.Ct. at 799, 39 L.Ed.2d at 64. However, given the limited size of the housing project and the number of applicants with a criminal record who might apply, I doubt whether any real burden would be placed on the defendant.

A number of jurisdictions have invalidated similar automatic exclusionary classifications regarding the suitability for tenancy in government-financed housing. *Cole v. Housing Auth. of Newport,* 435 F.2d 807 (1st Cir.1970) (nonresidents); *Male v. Crossroads Ass'n,* 469 F.2d 616 (2d Cir. 1972) (welfare recipients); *Thomas v. Housing Auth.,* 282 F.Supp. 575 (E.D.Ark. 1967) (unwed mothers); *Findrilakis v. Secretary of HUD,* 357 F.Supp. 547 (N.D.Cal. 1973) (very low income applicants); *Mandina v. Lynn,* 357 F.Supp. 269 (W.D.Mo. 1973) (very low income applicants); *Lopez v. White Plains Housing Auth.,* 355 F.Supp. 1016 (S.D.N.Y.1972) (noncitizens); *Colon v. Tompkins Square Neighbors, Inc.,* 294 F.Supp. 134 (S.D.N.Y.1968) (welfare recipients); *Ferguson v. Metropolitan Dev. and Housing Agency,* 485 F.Supp. 517 (M.D.Tenn.1980) (applicants owing prior unrelated debts); *Neddo v. Housing Auth.,* 335 F.Supp. 1397 (E.D.Wis.1971) (applicant owing prior unrelated debt); *Atkisson v. Kern County Housing Auth.,* 59 Cal.App.3d 89, 130 Cal.Rptr. 375 (1976) (unmarried cohabiters); *Housing Auth. v. Cordova,* 130 Cal.App.2d Supp. 883, 279 P.2d 215 (1955), *cert. denied,* 350 U.S. 969, 76 S.Ct. 440, 100 L.Ed. 841 (1956) (members of subversive groups); *Chicago Housing Auth. v. Blackman,* 4 Ill.2d 319, 122 N.E.2d 522 (1954) (members of subversive groups).

There is also persuasive authority in the area of employment discrimination on the issue of whether a criminal record can permissibly form the basis for an absolute bar from government employment. These cases hold that a criminal record cannot serve to disqualify a person from government employment unless the prior conviction bears some reasonable relationship to the nature of the employment.[3] *Green v. Missouri Pacific R.R. Co.,* 523 F.2d 1290 (8th Cir.1975); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir.1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Kindem v. City of Alameda,* 502 F.Supp. 1108 (N.D.Cal.1980); *McGarvey v. District of Columbia,* 468 F.Supp. 687 (D.D.C.1979); *Butts v. Nichols,* 381 F.Supp. 573 (S.D.Iowa 1974); *Richardson v. Hotel Corp. of America,* 332 F.Supp. 519 (E.D.La.1971), *aff'd per curiam,* 468 F.2d 951 (5th Cir.1972); *Dozier v. Chupka,* 395 F.Supp. 836 (S.D.Ohio 1975); *Hunter v. Port Auth.,* 277 Pa.Super. 4, 419 A.2d 631 (1980). In *Butts,* 381 F.Supp. at 580–81, the court said:

"There is no doubt that the State could logically prohibit and refuse employment in certain positions where the felony conviction would directly reflect on the felon's qualifications for the job (e.g., conviction of embezzlement and a job requiring the handling of large sums of money). The Iowa statutory scheme, however, has an across-the-board prohibition against the employment of felons in civil service positions. There is simply no tailoring in an effort to limit these statutes to conform to what might be legitimate state interests.

"... [N]o consideration is given to the nature and seriousness of the crime in relation to the job sought. The time elapsing since the conviction, the degree of the felon's rehabilitation, and the circumstances under which the crime was committed are similarly ignored."

Defendant argues in its brief that decisions regarding employment discrimination are irrelevant to housing situations because a tenant, unlike an employee, has the unrestricted, unsupervised use and possession of the landlord's property. I find defen-

---

**3.** In a related area, courts have concluded that blanket prohibitions against obtaining a business license because of a prior criminal record are invalid. *E.g., Genusa v. City of Peoria,* 475 F.Supp. 1199 (C.D.Ill.1979), *aff'd, in part, rev'd, in part,* 619 F.2d 1203 (7th Cir.1980); *Pentco, Inc. v. Moody,* 474 F.Supp. 1001 (S.D.Ohio 1978); *Secretary of Revenue v. John's Vending Corp.,* 453 Pa. 488, 309 A.2d 358 (1973); *Perrine v. Municipal Court,* 5 Cal.3d 656, 488 P.2d 648, 97 Cal.Rptr. 320 (1971), *cert. denied,* 404 U.S. 1038, 92 S.Ct. 710, 30 L.Ed.2d 729 (1972).

**434**

dant's distinction unpersuasive for two reasons. First, it is not at all clear that the landlord has no right to make reasonable inspections of the tenant's premises. Second, in the employment cases, the heart of the employer's argument was that the job required a great deal of unrestricted supervision and, therefore, necessitated a high standard of trustworthiness on the part of the employee. Certainly, if a criminal record cannot serve as an absolute bar to public service jobs requiring a measurable degree of public trust, it cannot serve as an absolute bar to government-subsidized housing.

An across-the-board, exclusionary policy such as this is patently too vindictive especially in light of this State's public policy in favor of reintegrating rehabilitated ex-offenders into the mainstream of society. In *Webb v. County Court*, 113 W.Va. 474, 476, 168 S.E. 760, 761 (1933), this Court said:

"Society must be protected from law violators, and their punishment must be just—commensurate with the seriousness of the offense. But the state does not punish malefactors in vengeance. She does not entertain against them throughout the years a spirit of vindictiveness, nor is the state relentless or unforgiving. It is the anxious desire of the state that those of her citizens who have transgressed her laws, suffered convictions, and paid the penalty of the law, shall profit from their unfortunate experience and thereafter make of themselves good citizens by leading lives of uprightness and usefulness. Society is interested in such result, and not in placing forever the brand of iniquity upon the forehead of one who in the frailty of humanity has departed from the narrow path."

*See also Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981).

For the foregoing reasons, I respectfully dissent. I am authorized to state that Justice McGraw joins me in this dissent.