Barbara **ROSS** et al., Plaintiffs, Individually and as representatives of a class,

v.

**COMMUNITY SERVICES, INC., et al., Defendants.**

**Civ. No. H–75–506.**

United States District Court, D. Maryland.

May 16, 1975.

Lawrence B. Coshnear, H. Robert Erwin, Jr. and Gerald Walsh, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

Mark K. Joseph and Gallagher, Evelius & Jones, Baltimore, Md., for the private defendants.

Jervis S. Finney, U. S. Atty., and Virginia S. Draper, Asst. U. S. Atty., Baltimore Md., Paul T. Michael, Stanley D. Rose and David Epstein, Dept. of Justice, Washington, D. C., for the federal defendants.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, District Judge:

Plaintiffs are low income tenants at the Uplands Apartments complex, which is located in Baltimore City and is a federally insured and assisted housing project under Section 236 of the National Housing Act. In this class action, plaintiffs seek to compel the Secretary of the Department of Housing and Urban Development (hereinafter "HUD") to implement and disburse operating subsidies under Section 212 of the Housing

and Community Development Act of 1974 (hereinafter the "1974 Housing Act"), 12 U.S.C. § 1715z–1. Plaintiffs also seek to enjoin the collection of a rent increase approved by HUD, effective May 1, 1975. Jurisdiction has been asserted pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702–704; the National Housing Act, 12 U.S.C. § 1701 *et seq.*; and 28 U.S.C. §§ 1331, 1337 and 1361. Named as defendants are the owners and manager of the apartments (hereinafter "the private defendants") and various HUD officials, including the Secretary of HUD.

On August 22, 1974, Congress enacted the 1974 Housing Act. Section 212 of that Act amended Section 236(f) of the National Housing Act by authorizing the Secretary to make additional assistance payments (or operating subsidies) to Section 236 project owners in order to cover increased utility costs and property taxes exceeding the project's operating expense level. Section 236 of the National Housing Act affords rental housing opportunities to low income families by providing mortgage insurance and interest reduction payments to mortgagees on behalf of project owners of newly constructed and rehabilitated housing. The private defendants here are such project owners.

The initial operating expense level in the amended statute equals the sum of utility costs and property taxes payable by the project owner at the time the Secretary determines that the project is fully occupied. For projects receiving mortgage insurance and interest subsidies before August 22, 1974, an initial operating expense level must be established by the Secretary not later than 180 days after that date, or by February 18, 1975. The additional subsidy payments may be made to a Section 236 project owner only where there are tenants residing in the project who pay more than 30 per cent of their income for rent. The maximum authorized operating subsidy is the amount necessary to reduce the rental charges of tenants paying more than 30 per cent of their income for rent down to 30 per cent of their income.

Section 212 also amended Section 236(g) of the National Housing Act by authorizing the Secretary to use excess rentals collected from project owners for the payment of these operating subsidies. Section 236(g) provides that the Secretary shall credit such excess rental charges to a reserve fund. Any balance in the reserve fund is to be used for the payment of the operating subsidies. The Secretary has decided, for reasons to be discussed more fully later, not to implement the provisions of Sections 236(f) and (g) in any way.

On March 28, 1975, HUD approved the private defendants' request for a rental increase. According to a letter from the Baltimore Area Director, the rent increase was attributable to "increased costs for utilities, real estate [taxes] and other justified operational costs." Shortly after the approval, plaintiffs were notified that their rents would be increased by 18 per cent effective May 1, 1975. Should plaintiffs and their class be required to pay this rent increase, they will have to use more than 30 per cent of their income to pay rental charges.

Plaintiffs assert that the increased cost of their rent is a cost which Congress mandated that the government must subsidize under Section 212 of the 1974 Act. They contend that the entire amount of these costs are not costs properly payable by Section 236 project tenants through increased rentals. Plaintiffs seek a declaration that HUD's approval of the rent increase was unlawful and that HUD owes plaintiffs a duty under Section 212 to provide operating subsidies to the owners of the housing project. Plaintiffs have sought preliminary and permanent injunctive relief and a writ of mandamus compelling the HUD defendants to disburse an operating subsidy to the owners of the project.

Presently before the Court are plaintiffs' motion for a preliminary injunction

and cross motions for summary judgment filed by the parties, as well as certain other motions. Suit was filed herein on April 22, 1975, and a Temporary Restraining Order was entered by Judge Young on April 28, 1975, prohibiting the private defendants from initiating ejectment proceedings to evict tenants who did not pay the challenged rent increases until further proceedings could be held in this case. The Temporary Restraining Order has now been extended until May 18, 1975, and because of the extreme urgency of this matter, rigid briefing schedules were set by the Court, briefs and affidavits and exhibits have been filed, and a full hearing has been held on the various motions that are pending.

The private defendants are placed directly in the middle by these proceedings. Plaintiffs and their class claim that HUD should pay all of the increased rentals, or that the increases should be rescinded. HUD claims that the tenants should pay the increase. Meanwhile, no one is paying, and the private defendants have been judicially restrained from evicting the plaintiffs and from collecting the rent increase from the plaintiffs. Yet, as noted hereinafter, it is clearly established on this record that the project owners are entitled to the rent increases in full. They are behind in their mortgage payments, and their mortgage may be foreclosed because of their default. Inflation and drastic cost increases, which have been recognized by HUD, entitle the project owners to the rent increases which have now been put into effect but restrained by this Court. For these reasons, the Court agreed to have this immediate hearing and to rule at once on the pending motions.

Several preliminary matters can be dealt with summarily. I am satisfied that this Court has jurisdiction under 28 U.S.C. § 1361 and/or under 28 U.S.C. § 1337. *Brown v. Weinberger,* 382 F. Supp. 1092, 1095–97 (D.Md.1974); *Bloodworth v. Oxford Village Townhouses, Inc.,* 377 F.Supp. 709, 714–15 (N.D. Ga.1974).

I am further satisfied that the plaintiffs have standing to bring this action as the challenged action has or will cause them injury in fact, and they are within the zone of interests to be protected by the statute in question. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Plaintiffs are clearly the ultimate beneficiaries of the operating subsidies available under Section 212 of the 1974 Housing Act, as their rents are reduced if the subsidies are paid.

Next, I find (and plaintiffs and the private defendants have agreed) that this is a proper class action. The class consists of those tenants at Uplands whose incomes do not exceed 80 per cent of the median income for the Baltimore area and whose rents, under the increases approved as of May 1, 1975, exceeded 30 per cent of their adjusted gross incomes. It is the rents paid by these tenants which are eligible for an operating subsidy under Section 212 of the 1974 Housing Act. The private defendants have determined, and plaintiffs have agreed, that 424 of the 989 tenants at Uplands are members of the class of persons whom plaintiffs represent. I am satisfied, on the record here, that all the requirements of Rule 23, F.R.Civ.P., have been met, and therefore that this is a proper class action.

With respect to the merits, I find first that there is no merit to plaintiffs' contention that this Court should enjoin the collection of all of the rent increase, effective May 1, 1975. The affidavits and other undisputed facts show that the increased rentals were justified by the landlord's increased costs of operation. And the undisputed facts further show that the increased costs used as a basis for the landlord's application to HUD seeking approval of increases in rent were reasonable costs and were justified by present economic conditions. The application for the increases was

properly submitted to HUD, and HUD's approval of the increase was entirely justified.

Plaintiffs further argue that the rent increases should be rescinded because HUD was required by law to consider whether or not to pay operating subsidies under Subsections (f)(3) and (g) of Section 236 before approving any such increases. There is no statutory support for such a contention. Nowhere does it appear in the Act that approval of a rent increase must await a determination whether the project qualifies for an operating subsidy. Under Subsections (f)(3) and (g), HUD should act within a reasonable time after a request for a subsidy is made, but not necessarily before an increase is approved.

We thus come to the real essence of the controversy here. The central issue presented is solely one of statutory construction. The statutory provisions in question are as follows:

Section 236(f)(3):

For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum, or such lower per centum not less than 25 per centum as shall reflect the reduction permitted in clause (ii) of the last sentence of paragraph (1), of the income of tenants occupying such units. Any contract to make addition-

al assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes, is reasonable and is comparable to cost increases affecting other rental projects in the community.

Section 236(g):

The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974.

The facts here are not in dispute. The question is: what duty does HUD have under these statutory provisions to pay operating subsidies to the Uplands project owners, under the undisputed facts? Some background discussion is necessary at this point.

The Housing Act of 1949, 42 U.S.C. § 1441 *et seq.*, which is the foundation for

subsequent housing legislation, mandated "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family," and provided that HUD "shall exercise [its] powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established."

Despite this legislation and subsequent efforts at implementing new housing programs, national housing objectives were not attained. In 1968, Congress responded by enacting the Housing and Urban Development Act, which, among other things, added Section 236 to the National Housing Act. Section 2 of the 1968 Housing Act reaffirmed the national goal of the 1949 Housing Act and noted that "this goal has not been fully realized for many of the Nation's lower income families." In Section 2, Congress declared that "the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality."

The 1974 Housing Act was designed to deal with problems which had occurred in the administration of federal housing programs since the 1968 Housing Act. Section 212, and in particular the subsections at issue here, subsections (f)(3) and (g), were intended to give the Secretary authority to adjust the subsidies for Section 236 project owners in order to meet increased operating costs. Under the 1968 Housing Act, the Secretary lacked authority to make such adjustments, with the result that increased operating costs were passed along from time to time *in toto* to tenants as increased rental charges.

The concern of the Congress about the effect of increased costs and resulting increased rents in Section 236 projects and its intent in enacting Section 212 of the 1974 Housing Act are expressed in the Senate Report which accompanies the Senate version of the Act, which was the one finally enacted. The Report in part is as follows:

The Committee was concerned with the problem experienced by projects where costs rise above those initially projected. Under the present program, there is no way of adjusting the subsidy to meet such costs, with the result that the burden falls upon lower income tenants, who may thus be required to pay far more than 25 percent of their incomes for their apartments. While anxious to deal with this problem, however, the Committee also of course desired to develop a provision which would focus upon the real problem cases and could be tightly administered and would not simply reward poor management.

Accordingly, the bill provides that for each project there would be established an initial operating expense level equal to the sum of the cost of utilities, maintenance, and local property taxes, taking into account anticipated and customary vacancy rates. On the basis of this initial level, the Secretary would be authorized to provide additional assistance payments in problem cases where needed to offset increases in the costs covered. These additional payments could not exceed the lesser of (A) the amount by which the sum of the cost of utilities, maintenance and local property taxes exceeds the initial operating expense level, or (B) the amount required to insure that the basic rent of any unit does not exceed 30 percent of the income of the tenant occupying such unit. Additional operating assistance payments could only be made where the increase in the cost item involved is reasonable and comparable to cost increases affecting other rental projects in the community.

Under the current law, where tenants in a project are able to pay more than the basic rent the excess is returned to the Federal Government and may be used for the production subsi-

dy now authorized. The Committee feels that it would be more appropriate if the "excess" funds derived from project operations were made available for the making of the additional assistance payments to offset operating costs. Accordingly, the bill provides that such excess rentals shall be credited to a fund which may be used by the Secretary for making the additional payments based on initial operating expense ratios, as described above. This provision would also be applied to projects in the current section 236 program. For these existing projects, it is expected that the Secretary would establish the "initial" ratios as of a date not later than 180 days after enactment of the bill.

S.Rep. No. 93–693, 93rd Cong., 2nd Sess. (1974), *reported in* 3 U.S. Code, Cong. & Admin.News, pp. 4273, 4303–04 (1974).

It should be noted that the word "maintenance" was ultimately removed from the legislation which thus now relates only to the excess "cost of utilities and local property taxes." Quite clearly, the Congressional intent was not to cover all of any increase in rents, but only some of the increase. Indeed, the word "offset" is used in this Senate Report.

The very situation envisioned by Congress has occurred here. Increased operating costs at Uplands have resulted in increased rents, which the record shows are entirely justified. Yet the low income tenants affected are unable to pay all or a part of such increased rents and may now face eviction. It was precisely this problem which led Congress to pass the 1974 amendments and to direct the Secretary of HUD to set aside excess rentals collected to pay operating subsidies where the conditions of the statute were met. Such subsidies inure, of course, to the benefit of the low income tenants.

█ But in the face of this Congressional intent, what has been HUD's approach? Simply put, HUD has adopted the position that it will not implement the program in any way. Claiming that it has been given broad discretion by Congress to make these payments, HUD has decided that it will exercise such discretion to make no payments at all to any projects at any time, whether worthy or not and whether the project might fully qualify under the Congressional standards or not.

The reasons for HUD's approach are quite frankly stated in the Secretary's Brief and are further stated in argument. HUD purely and simply disagrees with the Congressional policy. As stated in its Brief, at pages 31 and 32:

HUD has determined that it is essential to formulate a broad policy which will address itself to the economic problems facing all multifamily projects assisted by HUD. * * *

"The operating subsidy authorized by Section 236, however, is not addressed to the problems facing all multifamily projects assisted by HUD under the National Housing Act. These operating subsidies would benefit only Section 236 projects and, even then, would not be applicable to every Section 236 project. These operating subsidies thus will not have a significant effect upon the economic difficulties facing all multifamily projects assisted by HUD.

Of course, these subsidies benefit only Section 236 projects. Congress has flatly so provided. And of course the subsidies would not be applicable to every Section 236 project. Again, this was the clear Congressional intent spelled out in the legislation. Continuing from HUD's Brief:

Accordingly, the Secretary has exercised the discretion vested in her and has determined that implementation of these operating subsidies will not attack the general problems facing all multifamily projects. * * * Instead, HUD is considering a number of alternative proposals which would yield solutions which are more comprehensive and more equitable.

\* \* \* \* \* \*

While HUD is examining the potential effectiveness of the alternative approaches, it does not plan to implement the operating subsidies authorized by Section 236.

The position taken by HUD here is arbitrary and capricious and an abuse of discretion. As the Fourth Circuit said in *Campaign Clean Water, Inc. v. Train*, 489 F.2d 492, 498 (4th Cir. 1973), *vacated on other grounds*, 415 U.S. 36, 94 S. Ct. 1011, 39 L.Ed.2d 147 (1975):

> When the executive exercises its responsibility under appropriation legislation in such a manner as to frustrate the Congressional purpose, either by absolute refusal to spend or by a withholding of so substantial an amount of the appropriation as to make impossible the attainment of the legislative goals, the executive trespasses beyond the range of its legal discretion and presents an issue of constitutional dimensions which is obviously open to judicial review.

■ It is not HUD's prerogative to disagree with Congressional policy and refuse to implement it. An administrative agency is required to effectuate, not ignore, Congressional intent, whether the agency agrees with Congress or not. The judicial branch has the function of requiring the executive (or administrative) branch to comply with requirements set up by the legislative branch. *National Automatic Laundry & Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971).

■ I find on the record here that the federal defendants acted contrary to the requirements of Section 236(f)(3) and (g) when they refused to even consider whether under the circumstances of this case the private defendants were entitled or not to receive operating subsidies and whether the plaintiffs were entitled to the benefit of such subsidies. I will therefore order the federal defendants to comply with the law.

■ Plaintiffs have argued that the operating subsidies should equal the entire amount of the increase in their rent. Clearly, there is no support in the statute for this position. The increase is confined solely to increases in the costs of utilities and in local property taxes. It is estimated that this figure is approximately 50 per cent of the entire increase. Thus, the tenants themselves will have to pay the other portion of the rent increase. Congress undertook to alleviate the burden placed on tenants, but did not go all the way and provide that the operating subsidy should account for all of any increase such as this one.

■ Fashioning the appropriate relief presents some difficulty in this case. Parts of the statute place mandatory duties on HUD, but other parts quite clearly require HUD to exercise its discretion. The statute requires HUD first to establish an initial operating expense level for each project. This was required to be done before February 18, 1975, and the language used was "shall". Although the duty is mandatory, HUD has arbitrarily refused to comply with this portion of the statute. No determinations at all have been made in this or any other case. Under this Court's powers of mandamus, the defendants will be ordered to make this determination for this project. I might note that the undisputed facts show that the project was, as of August 1973, fully occupied, but HUD should make the determination under the law.

■ Other duties imposed on the Secretary by the statute are indeed discretionary. But this does not mean that the Secretary may flatly refuse to exercise her discretion at all. She must, under the statute, consider whether this project qualifies for an operating subsidy under the enactment. This includes determining whether the increase in the cost of utilities and local property taxes is reasonable and comparable to cost increases affecting other rental projects in the community. Presumably, this increased cost is reasonable and comparable. HUD has already approved a rent increase for this project based in part

on these increased costs, and it would be surprising if HUD suddenly now found such increases to be unreasonable or not comparable to others in the community, or if it suddenly found that this project has not been tightly administered or has been poorly managed. Of course, management has little control over utility cost increases and increased taxes, and it is difficult to understand how such increases might be attributable to poor management. If this project and these increases satisfy these requirements and if there is no other valid reason why this project should not receive the operating subsidy, HUD should pay it, provided that HUD finds that the balance in the reserve funds is sufficient. The record here shows $31 million presently in the reserve fund. It simply is not a valid reason for HUD to say that it does not approve of the Congressional policy and does not intend to pay these subsidies to anyone, or that it would like to allocate this amount for payment elsewhere. In exercising its discretion, HUD should set forth reasons for the conclusion it reaches. The Court and the parties will then be able to determine whether such discretion has been properly exercised.

■ One further point should be considered. The federal defendants argue that the Secretary has no available contract authority to make these payments and that Congress must first release contract authority, specifically approving payments for each operating subsidy. This Court would disagree. Congress allowed the Secretary to release her own contract authority for operating subsidies of this sort by allowing the Secretary to add the special reserve fund here to appropriations previously authorized.

■ I do not find that it was the intent of Congress in enacting Section 212 of the 1974 Housing Act to require that the Secretary would have to come back to Congress for contract authority each time it wished to expend these reserve funds. Congress directed in Subsection

(g) that the excess reserve fund "shall be available" for the purpose of making these payments. This Court has previously found that the Congressional intention was that the funds set aside in this special reserve should be expended, if the Secretary makes the findings required in Subsection (f)(3). Certainly, it would make little sense (and indeed would render the program inoperative as a practical matter) if as to each project the Secretary would have to come back to Congress to secure contract authority to expend the necessary sums. The Secretary's argument as to a lack of contract authority here is no more than another aspect of the argument previously rejected that she has complete discretion to refuse to implement Congressional policy. This was a special reserve fund, created by excess rental charges, and not included in any Congressional appropriation. Thus, it is not subject to restrictions applicable to other appropriations under Section 236. Furthermore, I do not find that the Secretary had discretion to allocate this reserve fund for some purpose other than the payment of operating subsidies as provided in Subsections (f)(3) and (g).

■ What this Court will do is grant the preliminary injunction as to the federal defendants and retain jurisdiction of the case until the necessary determinations have been made by HUD. If the operating subsidies are approved, then that will end the case. If disapproved, plaintiffs will be entitled to consider the reasons for such disapproval and then apply to the Court for further relief if plaintiffs conclude that the Secretary has abused her discretion. Meanwhile, the Secretary will be ordered to pay the operating subsidy to the private defendants, commencing as of May 1, 1975. And the plaintiffs should pay, as of May 1, 1975, the portion of the increase not covered by increased utility or property tax costs.

The requirements for the entry of a preliminary injunction were set forth by the Fourth Circuit in *West Virginia*

*Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232, 235 (4th Cir. 1971), as follows:

> [I]t is sufficient if the court is satisfied that there is a probable right and a probable danger and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant.
>
> \* \* \*

Other Fourth Circuit cases have indicated that the inquiry must also determine whether plaintiff will suffer irreparable injury if the injunction does not issue. *Long v. Robinson*, 432 F.2d 977 (4th Cir. 1970).

All of these requirements have been met here. I find that the plaintiffs will probably succeed in this case to the extent covered by the statute because the facts in the record indicate that this project probably will satisfy the requirements for a subsidy. If these payments are not ordered to be made at this time, plaintiffs may suffer irreparable harm. In balancing the equities, I would note that the effect of not entering a preliminary injunction would be considerable as far as the plaintiffs are concerned and as far as the private defendants are concerned, but that HUD would suffer very little if required to pay this operating subsidy from the $31 million available, during the pendency of this litigation. There are excess rentals now in existence in HUD's hands from which these payments can be made, and Congress has mandated that payments should be made if HUD determines that the statutory prerequisites have been met.

Finally, some of the cases say that the Court should consider the public interest in deciding whether or not to grant a preliminary injunction. There are two aspects of such a consideration here. First, it is of the utmost interest to the public that administrative bodies obey the law. Secondly, it is in the public interest that these low income tenants receive the help that Congress has directed they should receive, if, as it appears, they qualify for it.

I would suggest that counsel meet and prepare an Order which will grant the preliminary injunction. The Order should designate the class, it should include a brief statement as to a declaratory decree or finding of the Court, and it should require the plaintiffs to pay the part of the rent that they have to pay. The Order should require the federal defendants to pay the subsidy as required by law and should direct the federal defendants to make determinations as promptly as possible under the statute. Finally, the Order should also provide that the Court would retain jurisdiction for any further proceedings necessary.