Margaret RESSLER, et al., Plaintiffs/Appellees/Cross-Appellants,

v.

Samuel R. PIERCE, Jr., et al., Defendants/Appellants/Cross-Appellees.

Nos. 81–3294, 81–3404.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 20, 1982.

Decided Nov. 2, 1982.

Bessie O'Rourke, Alaska Legal Services Corp., Anchorage, Alaska, for Ressler.

Linda Jan S. Pack, Washington, D.C., for Pierce.

On Appeal from the United States District Court for the District of Alaska.

Before PREGERSON, ALARCON, and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

This is a class action against the Secretary of Housing and Urban Development ("HUD") and the owners of certain subsidized housing in Alaska. Plaintiffs are applicants and potential applicants for HUD rent subsidies under the Section 8 Set-Aside

Program, 42 U.S.C. § 1437f (1978 & Supp. 1982), of the Housing and Community Development Act of 1974 ("the Section 8 program"). Plaintiffs allege that they were denied due process and equal protection by the manner in which the owners of a subsidized apartment complex processed their applications for rent subsidies.

These are cross appeals from two orders of the district court. In Appeal No. 3294, HUD appeals the court's ruling that applicants for Section 8 benefits must be afforded Fifth Amendment due process protection in the application and selection process. HUD also argues that, in the event this court determines that due process is required, the procedures ordered by the court should be modified in several respects. In Appeal No. 3404, Plaintiffs appeal both the application and selection procedures ordered by the district court and the court's ruling that HUD is not required to ensure that project owners rent to Section 8 applicants all units for which Section 8 subsidies are available.

We affirm that part of the district court's judgment holding that applicants for Section 8 benefits are entitled to due process protection. We also affirm the court's ruling that HUD need not require owners to utilize all available Section 8 subsidies. However, because we believe that certain application and selection procedures ordered by the district court should be modified, we also reverse the court's order in part and remand the case for further proceedings.

FACTS

Plaintiff Margaret Ressler moved into Jewel Lake Villa apartments in Anchorage, Alaska, in August 1977. Because the owners of Jewel Lake Villa were receiving mortgage insurance benefits from HUD under Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (1980 & Supp. 1982), low-income tenants such as Ressler were eligible for rent subsidies under the Section 8 program.

Ressler inquired about the Section 8 rent subsidies and was told by an employee of Jewel Lake Villa that none were available. Ressler was not given a written application, nor was she put on a waiting list. Ressler was told that she would be notified if any Section 8 benefits became available.

Having received no such benefits by November 1977, Ressler filed the instant action. Ressler alleged that she had been denied Section 8 rent subsidies improperly for two reasons. First, Ressler contended that the absence of procedural safeguards in the application and selection process was a denial of due process and equal protection. Second, Ressler argued that HUD's failure to require project owners to rent to Section 8 applicants all units for which Section 8 subsidies are available violated the national housing policy and constituted an abuse of discretion by HUD. The parties made cross motions for summary judgment.

By a Memorandum and Order filed March 6, 1980, the district court granted partial summary judgment in favor of Ressler, holding that Ressler had a "legitimate, objectively justifiable claim" to Section 8 benefits which entitled her to due process protection.[1] The court invited further briefing on the issue of the form and extent of procedural due process to be afforded Section 8 applicants. The court also granted partial summary judgment in favor of HUD, ruling that HUD's failure to require project owners to utilize all available Section 8 benefits was not inconsistent with the national housing policy and did not constitute an abuse of discretion.

After considering the parties' proposed application and selection procedures, the court issued a final judgment setting forth the requisite procedures in three phases: (1) tenant-selection criteria; (2) a waiting list procedure; and (3) notice and hearing procedures. These cross appeals followed.

ANALYSIS

1. *Entitlement to Due Process*

■ HUD argues that an applicant for Section 8 benefits does not have a protecti-

---

1. The district court did not reach Ressler's equal protection claim, holding that resolution of the due process issues "effectively resolves the issue of procedural safeguards." Memorandum and Order filed Mar. 6, 1980, at 5.

ble "property" interest in those benefits because project owners are vested with a certain amount of discretion in selecting among qualified applicants. HUD's argument has two basic components. First, HUD points to the U.S. Supreme Court's decision in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in which the Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709. Second, HUD reads this court's decision in *City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir. 1978), as requiring a "certainty of receipt" of benefits before a right to due process attaches. Consequently, according to HUD, there can be no due process entitlement where the receipt of benefits depends upon the exercise of discretion in the selection process.

HUD has overstated the holding of *City of Santa Clara.* In that case, the court found *Roth* to be directly dispositive of the question whether the City of Santa Clara had a protectible "property" interest in power allocations from the Central Valley Project. Common to both *Roth* and *City of Santa Clara* was the fact that the entity charged with dispensing governmental benefits had "unbridled discretion" in the selection process. In each case, the applicant was held to have an insufficient "property" interest in the benefits to give rise to due process procedural safeguards.

It is clear, however, that the owners of Jewel Lake Villa had only limited discretion in the Section 8 application and selection process. While under the Section 8 program "the selection of tenants . . . shall be the function of the owner," 42 U.S.C. § 1437f(d)(1)(A) (Supp.1982), the regulations and guidelines promulgated pursuant to the statute closely circumscribe an owner's discretion. For example, the regulations dictate what percentage of the Section 8 contract units an owner must rent to "very low-income families" (24 C.F.R. § 886.117(b) (1982)) and require the owner to select eligible tenants in accordance with a HUD-approved marketing plan (*id.* § 886.121(a)). In addition, HUD's administrative guidelines set eligibility standards for Section 8 applicants, provide detailed application and instruction forms, establish rules for the calculation of an applicant's income and allowances, and require HUD review of all certificates of eligibility after determinations have been made by project owners. *See* HUD Handbook 4352.1, "Loan Management Section 8 Set-Aside," ¶¶ 23–26 ("HUD Handbook").

The instant case is thus similar to *Griffeth v. Detrich,* 603 F.2d 118 (9th Cir. 1979), in which this court found that applicants for general relief had a protectible claim of entitlement to benefits based solely on the limiting language in the authorizing statute and regulations. In rejecting the argument that applicants could have no legitimate claim to benefits because each county had discretion in establishing eligibility criteria, the court held:

> The regulations adopted by San Diego County are detailed. They set forth specific objective eligibility criteria for receipt of aid. . . . The regulations are comprehensive and definite. They greatly restrict the discretion of the intake eligibility worker. . . . Here the authorizing statute coupled with the implementing regulations of the county creates a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements.

*Id.* at 121. *Cf. Jacobson v. Hannifin,* 627 F.2d 177, 180 (9th Cir. 1980) ("A property interest may be created if 'procedural' requirements are intended to operate as a significant substantive restriction on the basis for an agency's actions.").

In addition, Ressler has a constitutionally protected "property" interest in Section 8 benefits by virtue of her membership in a class of individuals whom the Section 8 program was intended to benefit. 42 U.S.C. § 1437f(a) (1978) provides:

For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in accordance with the provisions of this section.

A similar statutory statement of purpose was held to give rise to a legitimate claim of entitlement in *Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974). The statute at issue in *Geneva Towers* had a declared purpose "to assist private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715*l*(a). This court affirmed the ruling of the district court that beneficiaries of the statute had to be accorded due process safeguards, holding:

> Congress' purpose was ... to provide the tenants with the benefit of low cost housing. *The source of the tenants' entitlement is explicit: it lies in the congressionally stated purpose of providing persons of meager economic means with low-priced housing ... and the statutory requirement that the FHA regulate the rents charged by the private developer* ....

504 F.2d at 490 (emphasis added).

The same rationale applies to give Ressler a protectible claim of entitlement to Section 8 benefits. Ressler is a primary beneficiary of the Section 8 program, and her receipt of benefits is closely monitored by HUD under the implementing regulations and guidelines. Ressler thus has a sufficient "property" interest in Section 8 benefits to entitle her to due process safeguards in the processing of her application.

Finally, the facts and circumstances of the instant case are themselves a compelling argument for affording at least some due process safeguards to Section 8 applicants. Ressler was not allowed to submit an application for benefits to Jewel Lake Villa in August 1977 based upon a representation by a Jewel Lake Villa employee that no benefits were then available. In fact, it appears from the record that there were as many as seventeen unallocated Section 8 leases at Jewel Lake Villa between August and October 1977. Ressler should have been given some means of ensuring that her application for Section 8 benefits was received and given meaningful review.

2. *Application and Selection Procedures*

In its Judgment filed April 20, 1981, the district court ruled that project owners under the Section 8 program were required to implement certain specified procedures regarding (1) tenant-selection criteria; (2) a waiting list procedure; and (3) notice and hearing procedures. Ressler and HUD claim in their appeals that the procedures ordered by the district court should be modified in several respects.

Both Ressler and HUD agree that the test articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), controls the determination of what process is due. In *Mathews* the Court stated that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

The parties have argued at length regarding the weight that each of the *Mathews* factors deserves in the context of the Section 8 program. Ressler refers repeatedly to the statement of the district court that "[t]he 'private interest' of the 'lower income' or 'very low-income' family ... is enormous." (Memorandum and Order filed Nov. 24, 1980, at 5.) Ressler also argues that the government involvement in Section 8 projects is so great that the actions of the project owner are tantamount

to those of the government, thus making the only relevant "private interest" that of Section 8 applicants. HUD, on the other hand, urges that every project owner has a substantial interest in ensuring that the application procedure is easy to administer and does not frustrate his efforts to select satisfactory tenants.

A brief review of several basic due process principles is of aid in according the proper weight to the *Mathews* factors in the instant case. First, having determined that Ressler has a sufficient "property" interest in Section 8 benefits to be entitled to due process protection, this court need not look further at the *nature* of Ressler's interest but must focus primarily on its *weight. See Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

To that end, while "the legitimacy of an alleged interest does not inherently depend upon whether the person has previously been receiving the desired benefit" (*Davis v. United States,* 415 F.Supp. 1086, 1092 (D.Kan.1976)), it is indisputable that Ressler, as an *applicant* for governmental benefits, has a less weighty interest than someone who is currently receiving benefits and is threatened with reduction or termination of those benefits. *See, e.g., Richardson v. Perales,* 402 U.S. 389, 406–07, 91 S.Ct. 1420, 1430, 28 L.Ed.2d 842 (1971).

Finally, to the extent that the "private interest" of the owners of Jewel Lake Villa merges with the government's interest, the owners' interest may deserve more weight, rather than less weight as Ressler contends. For example, in *Fuentes v. Shevin,* 407 U.S. 67, 92–93, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 (1972), the Supreme Court recognized that the interest of a private creditor seeking summary seizure of goods would be weighed less heavily than the government's interest in summary proceedings in a comparable situation. Since owners involved in the Section 8 program carry out an important governmental purpose, they should be spared all unnecessary administrative burdens.

With these principles in mind, the objectionable portions of the district court judgment may be analyzed as follows:

(a) *Tenant-Selection Criteria*

▮ The district court judgment stated, in part:

TENANT SELECTION CRITERIA USED BY PRIVATE PROJECT OWNERS

1. Owners shall establish written tenant selection criteria.

2. All prospective applicants must be provided with a copy of the criteria.

3. Tenant selection criteria must relate to the ability of the applicant to fulfill lease obligations and should not automatically deny tenancy to a particular group or category of otherwise eligible applicants.

4. The following are illustrative of the types of criteria which the owner may establish:

a. Demonstrated ability to pay rent and make timely payments.

b. Good credit references.

c. Positive endorsements from prior landlords.

d. Absence of a record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences which may adversely affect the health, safety, or welfare of other tenants.

e. Other good reasons related to the applicant's ability to fulfill lease obligations.

5. If the owner chooses to establish criteria similar to "other good reasons" (4–e) and further chooses to reject a particular applicant based upon these criteria, the notice to the applicant advising the applicant of the determination shall specify the particular reason for the rejection.

Ressler contends that these criteria are not "reasonable" and "ascertainable," citing *Holmes v. New York City Housing Authority,* 398 F.2d 262 (2d Cir. 1968). In particular, Ressler argues that subparagraphs 4b and 4c are unnecessary, since a project own-

er would obtain the same information pursuant to subparagraph 4a. Similarly, she argues that subparagraph 4e is duplicative of paragraph 3 and subparagraphs 4a and 4d and thus is also necessary.

There is no need to disturb the district court judgment in these respects. Subparagraphs 4a through 4d are expressly stated to be merely "illustrative" of permissible selection criteria; owners are free to use any or all of these criteria or to develop other criteria pursuant to subparagraph 4e. Whatever criteria are ultimately established must, to be in accordance with paragraph 3, "relate to the ability of the applicant to fulfill lease obligations and should not automatically deny tenancy to a particular group or category of otherwise eligible applicants." These requirements should provide project owners with the discretion reserved to them under 42 U.S.C. § 1437f(d)(1)(A) (Supp.1982) and keep the exercise of that discretion within reasonable limits.

Ressler also objects to the tenant-selection criteria as a whole as being so broad that they conflict with the purposes of the National Housing Act and encourage abuse and discrimination by project owners. The short answer to these objections is that the National Housing Act grants project owners a certain amount of discretion in selecting among qualified applicants. If an applicant believed that such discretion had been abused, some form of administrative review would be immediately available (*see* Section 2(c), *infra*), with judicial review an eventual alternative.

### (b) *Waiting List Procedure*

■ The district court judgment further stated:

### WAITING LIST PROCEDURE

1. If the owner of a project participating in the Section 8 program determines that the family is eligible for a unit with Section 8 assistance and is otherwise acceptable and that units are available, the owner will assign the family a unit of the appropriate size in accordance with HUD standards. If no suitable unit is available and the owner has suitable units under contract, the owner will place the family on a waiting list for the project and notify the family of when a suitable unit may become available. If the waiting list is so long that the applicant for a unit with Section 8 assistance would not be likely to be admitted for the next 12 months, the owner may advise the applicant that no additional applications are being accepted for that reason.

2. Selections from the waiting list shall be made chronologically, according to the date of submission of the application for § 8 benefits, except where certain applicants are entitled to priority as a matter of law.

3. The waiting list will be made available to the applicants upon request in the office of the project manager.

Both HUD and Ressler seek modification of the waiting list procedure outlined above. Ressler contends that a project owner should be required to maintain separate waiting lists for each size of unit within the project. Without separate lists, Ressler maintains, there is a likelihood that eligible applicants who are on the waiting list will be forced to continue waiting even after an appropriate unit becomes available. Ressler further argues that applicants should be given written notice of (1) the fact that they have been placed on a waiting list; (2) their place on the list; and (3) their minimum estimated waiting period.

Ressler's suggested modifications are substantially—if not completely—covered by the procedures contained in the district court judgment. Paragraph 1 requires an owner to notify qualified applicants that they have been placed on a waiting list and to give them estimates "of when a suitable unit may become available." In addition, the directive that a project owner assign an applicant from the waiting list to "a suitable unit" when one becomes available implicitly requires that the waiting list indicate what size unit each applicant on the list is waiting for. Finally, all applicants would have ready access to the waiting list under paragraph 3 in order to determine

their place on the list. Thus, this portion of the judgment in its present form is a sufficient answer to Ressler's objections.

HUD's proposed modification of the waiting list procedure is to extend the priority provision of paragraph 2 to include current tenants who may have applied or qualified for Section 8 benefits later than non-tenants. Otherwise, HUD argues, project owners might be forced to evict current tenants who could not then pay their full rent and replace them with new and unknown tenants who happen to stand higher on the Section 8 waiting list.

HUD's proposal is a reasonable attempt at solving the "identifiable problem" of "high vacancies and/or turnover" in subsidized housing projects. 24 C.F.R. § 886.-107(g) (1982). Current tenants are already encouraged to apply for Section 8 benefits under the HUD guidelines. HUD Handbook at ¶ 24(a). Statutory preference is already mandated for "families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance . . . ." 42 U.S.C. § 1437f(d)(1)(A) (Supp.1982). Establishing a priority for current tenants is simply a form of local residence preference, which is allowed "to the extent that [it is] not inconsistent with affirmative fair housing marketing objectives and the owner's HUD-approved Affirmative Fair Housing Marketing Plan." 24 C.F.R. § 886.321(b)(1) (1982). Such a priority might, in addition, encourage owners to make full utilization of their Section 8 contract authority. HUD's proposed modification should be adopted.

(c) *Notice and Hearing Procedures*

█ The district court judgment further provided:

NOTICE AND HEARING PROCEDURES

1. If the owner determines that an applicant is ineligible for a unit with Section 8 assistance on the basis of income or family composition, or that the owner is not selecting the applicant for other reasons related to his ability to fulfill his obligations as a tenant of the project, the owner will notify the applicant in writing within 15 days of that determination and of the specific reasons for it. The written notification shall state: (1) that the applicant has 14 days from receipt to submit a written response to the notice to the local HUD officials; (2) that the applicant may have an attorney or other representative prepare a written response, or appear at the local HUD office; (3) that the applicant's response to the notification does not preclude him from exercising his other rights if he believes he is being discriminated against on the basis of race, creed, religion, sex, or national origin.

2. The review of either the applicant's written response or of the information provided at the informal meeting will be undertaken by an employee at the local HUD office. Within 5 working days of receipt of said written response or of the date of the meeting, HUD shall advise the applicant in writing as to whether the owner's determination is approved or reversed.

3. If, after review, the owner's finding of ineligibility is reversed, the applicant will be placed in a suitable vacant unit, if available. If no such unit is available, he will be placed on a waiting list.

4. The owner will be required to maintain in its files for one year the application, the notification of eligibility or ineligibility, the applicant's written request for a meeting or written response to a negative determination, if any, any other written submissions presented by the applicant or his representative in support of his position, and a copy of HUD's written determination.

Ressler and HUD object to different portions of the district court's notice and hearing procedures. Ressler contends that the procedures should be revised to require (1) that the project owner make eligibility determinations and notify all applicants within five working days of the date of application; (2) that rejected applicants be furnished with "the particular reason for the rejection" in every case; and (3) that the notice of rejection contain information regarding area legal services or other advocacy groups.

Ressler's second proposed modification is easily disposed of. Her apparent concern is that, under the court-ordered procedure in its present form, rejected applicants will not be notified of the specific grounds therefor unless rejection is pursuant to paragraph 4e of the court's tenant-selection criteria. Ressler has, however, overlooked the requirement of paragraph 1 of the notice and hearing procedures, which states that "the owner will notify the applicant in writing within 15 days of that determination [of ineligibility] *and of the specific reasons for it.*" (Emphasis added.) Thus, rejected applicants will know the basis for rejection in every case.

Ressler's third proposed modification is well taken. Requiring project owners to maintain a list of local legal services organizations would impose only a slight burden on the owners and would be of value to applicants who claim to have been denied benefits erroneously. That such a requirement would not place an undue fiscal or administrative burden on project owners or HUD is evidenced by the fact that similar lists must be maintained by government agencies in other contexts.[2] Thus, supplying legal services information to rejected applicants should be considered a due process requirement.

Ressler's first point—that owners should make eligibility determinations and give notice thereof within five days of the date of application—also raises important due process issues. The district court's procedures contain no time limit on the processing of applications; owners are only required to serve written notice to rejected applicants within fifteen days of the date that a determination is made. The court in *Colon v. Tompkins Square Neighbors, Inc.,* 294 F.Supp. 134 (S.D.N.Y.1968), when confronted with similar application and selection procedures, held:

> In order to avoid keeping applicants in a state of indefinite suspension pending a determination of their applications, a reasonable time limit should be agreed upon between the parties herein within which the Rental Committee should be required to complete its investigation of an applicant and notify the applicant as to the results thereof. Due to the steady inflow of applications for low and middle income housing accommodations, the directors of Haven Plaza cannot be expected to process them with the same dispatch as would be anticipated from a private rental agent. Nevertheless, a time limit should be established by the parties herein which, although taking into account the amount of applications which steadily burdens the Rental Committee, primarily caters to the interest of the applicants in a prompt determination of their status and in having adequate time to obtain a review thereof.

*Id.* at 139. Although *Colon* was decided before *Mathews,* a balancing of the applicants' and owners' interests still requires some time limit on eligibility determinations.

The five-day time limit suggested by Ressler is, however, unreasonable. Owners would likely find it extremely difficult to assemble the "accurate verification records" of income and allowances mandated by the HUD guidelines, which require, among other things,

 (a) Letters or other statements from employers and other pertinent sources giving authoritative information concerning all items and amounts of income,

 (b) Photocopies or carbon copies of documents in the applicant's possession which substantiate his statements, or a brief summary of the pertinent contents of such documents signed and dated by the reviewer,

 (c) Certified statements or summary data from books of account from self-employed persons, and from persons whose earnings are irregular, such as

---

**2.** *See, e.g.,* 8 C.F.R. § 2922.1 (1982), which requires district directors of the Immigration and Naturalization Service to maintain a current list of free legal services programs within their respective jurisdictions "for the purpose of providing aliens in deportation or exclusion proceedings with a list of such organizations."

salesmen, taxi drivers, etc., setting forth gross receipts, itemized expenses, and net income. . . .

HUD Handbook at ¶ 23e(1).

At the same time, applicants have a substantial interest in ensuring that their applications are processed as quickly as possible. Moreover, as Ressler points out, preparation of a proper notice, once the eligibility determination has been made, would not require the fifteen-day period approved by the district court. In our view, the fairest accommodation of these competing interests is to give owners fifteen days from the date of application within which to make eligibility determinations *and* give applicants the required notice.

With respect to the review procedures ordered by the district court, HUD argues that an impartial staff member of the owner—not HUD—should conduct the review of rejected applications. HUD contends that the procedure as ordered (1) is inconsistent with the statutory requirement that selection of individual tenants be made by project owners, rather than HUD; (2) is unnecessary because an impartial representative of the owner can provide a fair review; and (3) would be extremely costly and burdensome to HUD.

HUD raises a difficult issue, since the potential economic and administrative burden to HUD of reviewing rejected applications—HUD's third rationale—requires that the government's interest be factored into the *Mathews* balancing formula. HUD's two other rationales are not persuasive, however. First, HUD review would not usurp project owners' tenant-selection discretion. Eligibility determinations are already subject to HUD review (HUD Handbook at ¶ 26), and HUD may examine general project operation "at such intervals as it deems necessary to ensure that the Owner is in full compliance with the terms and conditions of the [Section 8] Contract" (24 C.F.R. § 886.130 (1982)). Requiring HUD also to review rejected applications would not interfere to any significant extent with an owner's tenant-selection discretion.

Second, it seems unlikely that a project owner's representative could provide a meaningful and impartial review of rejected applications. The difficulties with such an approach in the context of evictions from public housing have been described by one commentator as follows:

> Imposing a requirement of providing a hearing before eviction on the private landlord has a number of serious disadvantages. First, it imposes a much more substantial burden on the landlord than a requirement of participation in a hearing which someone else must provide. Second, a private landlord is likely to be totally inexperienced in running an administrative hearing; thus, the hearing is less likely to reach a correct result efficiently. Finally, the problem of "separation of function" of prosecutor and decisionmaker, serious but soluble in the context of an administrative agency, may be insoluble in the case of a private landlord who, wanting to evict a tenant, is called upon at the same time to be an impartial decisionmaker.

Note, *Procedural Due Process in Government-Subsidized Housing,* 86 Harv.L.Rev. 880, 908 (1973). Although similar review procedures have been utilized where an agency or business was sufficiently large and diverse to make impartial review by a designated employee possible (*see, e.g., Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)), any such procedure would be inappropriate where, as here, project owners have relatively few employees, most or all of whom may have been involved in the initial eligibility determination.

Thus, the private interest of Section 8 applicants in a fair review of rejected applications outweighs project owners' fears of losing the statutory grant of discretion in selecting among eligible tenants. In addition, the risk of an erroneous deprivation of the applicants' protected "property" interest is measurably greater without HUD review. Yet to be assessed, however, is the government interest in avoiding the additional "fiscal and administrative burdens" which HUD review would entail.

HUD argues in this regard that it would have to increase its professional loan-management staff approximately seven percent nationwide at a cost of more than $2,000,-000 to provide review of rejected Section 8 applications. Of course, this projection is purely speculative, since HUD can only guess how many applicants would seek review and, of these, how many reviews would be by written response rather than personal appearance.

The district court struck a proper balance under the circumstances. It stated that, "[w]hile the court is mindful of the cost associated with such a procedure, the importance of the applicant's interest and the increased risk of an erroneous eligibility determination by a private project owner" require review by an impartial HUD employee. (Memorandum and Order filed Nov. 24, 1980, at 11.) Thus, the notice and hearing procedures in the district court judgment should be modified to state a time limit for the processing of applications and notification of applicants but should retain the provision for informal HUD review.

### 3. *Abuse of Discretion by HUD*

 Ressler argues that HUD's failure to require project owners to rent to Section 8 applicants all units for which Section 8 subsidies are available violates national housing policy and constitutes an abuse of discretion. According to Ressler, what the district court characterized as the "sanction approach" of 24 C.F.R. § 886.129 (1982), which allows HUD to reduce the number of units under Section 8 contract authority when a project owner fails to lease or have available for leasing by eligible families eighty percent of its Section 8 units, restricts the access of low-income people to Section 8 projects.

Ressler apparently asks this court to "hold unlawful and set aside" HUD's non-utilization policy as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1977). The Supreme Court has held that

[t]o make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

HUD's policy of requiring project owners to maintain eighty percent utilization of Section 8 contract authority is not an abuse of discretion under this analysis. The flexible nature of the policy might reasonably have been intended to encourage owner participation in the Section 8 program. In any event, in establishing the policy HUD did not "disagree with Congressional policy and refuse to implement it," *Ross v. Community Services, Inc.,* 396 F.Supp. 278, 286 (D.Md.1975), nor did it fail to act "in a manner which is consistent with the objectives and priorities of the National Housing Act," *Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir. 1980) (footnote omitted). *See also Daniels v. United States Department of Housing & Urban Development,* 518 F.Supp. 989 (S.D.Ohio 1981) (100% occupancy of HUD-owned rental property not required). The determination of the district court that HUD's policy was not an abuse of discretion is therefore affirmed.

### SUMMARY

The matter is remanded so that the tenant-selection criteria ordered by the district court may be modified (1) to give priority on the waiting list to current tenants over non-tenants; (2) to require project owners to make available to Section 8 applicants a list of local legal services organizations; and (3) to allow project owners a maximum of fifteen days from the date of application within which to make eligibility determinations and give applicants proper notice thereof. The district court should retain jurisdiction to review and/or modify the application and selection procedures in the event that they prove to be in any way inadequate or impracticable. The district

court judgment, which ably and carefully resolved a number of complex and difficult issues, is in all other respects affirmed.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.